1  Paul Kingston, appearing in *propria persona*

2  11 Silvercreek Ln, Ballwin, MO 63011

3  Phone: (314)601-4662

4  E-mail: Picasso.dilly@gmail.com

5

6

7

**FILED**

**AUG 25 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11  ,United States of America

12              Plaintiff,

13      v.

14  ,Paul Kingston

15              Defendant.

16

17

18

19

**Case Nos**. U.S. District - 2:25-cr-00047-DC

Magistrate – 3:24-po-00182-DMC

**APPELLANT BRIEF**

Hearing Date: TBD under the Honorable
District Judge Dena M Coggins

20              **I TABLE OF CONTENTS**

21

22      I-Table of Contents              P 1

23      II- Table of Authorities          P 3

24      III- Jurisdictional Statement     P 5

25      IV- Issues Presented for Review   P 6

26      V- Facts and Procedural History   P 7

27      VI- Summary of Arguments          P 11

28      VII- Standard of Review           P 13

1    VII- Arguments                                    P 14

2            (A) Free exercise of religion                        [P 14]

3            (B) Freedom to assemble for expressive purposes        [P 23]

4            (C) Arbitrary and capricious/ unwarranted by the facts    [P 25]

5    VII- Conclusion and relief sought              P 28

6
        *Exhibits and Authorities not in reporter are displayed in a separate volume-
7    "APPELLATE BRIEF: Exhibits, and Authorities not in reporter."*

8    *NOTE: Document #'s refer to the case on appeal unless otherwise stated*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          **II TABLE OF AUTHORITIES**

2

3          COURT CASES

4          District Courts

5

6          *United States v Aglialoro, et al, 2001 WL 209912, (D. Or. 2001)* cited on pp 23

7          *United States v. Rainbow Family, 695 F. Supp. 294 (E.D. Tex. 1988)* cited on pp 15

8          *U.S. v White, case no: 3:96-cr-05177-JKA-1, (W,D, Wa. 1996)* cited on pp 23

9

10         Circuit Courts

11

12         *Collins V. Jordan, 110 F.3d 1363 (9th Cir. 1997)* cited on pp 22

13

14         Supreme Court

15

16         *Madsen v. Women's Health Center, Inc., 512 U.S. 753 (1994)*- cited on pp 12, 23-25

17         *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29 (1983)*-

18         cited on pp 25-26

19         *Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969)*- cited

20         on pp 20-21

21         *Welsh v. United States, 398 U.S. 333 (1970)*- cited on pp 11, 16,-18

22

23         STATUTES

24

25         *5 USC § 706* – cited on pp 6, 11, 13, 25-28

26         *42 USC § 2000bb, "Religious Freedom Restoration Act"*- cited on pp 14, 18-19, 23

27         *42 USC § 2000cc, "Protection of Religious Exercise in Land Use and by Institutionalized*

28         *Persons Act." (PRELUIPA)*- cited on pp 14, 17

1

2       <u>Other Authorities</u>

3

4           Government Accountability Office: *Rangeland Management: Profile of the Forest*

5  *Service's Grazing Permit's and Allotments (1993)* cited on p 22

6           National Forest Service: *Forest Service Handbook "Law Enforcement Handbook" FSH*

7  *5309.11, Chapter 30* cited on pp 7,10

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## III JURISDICTIONAL STATEMENT

2

3       **A** – This appeal concerns a Federal citation issued on Federal land within the Eastern

4   District of California, and the issues on appeal concern an Eastern District Magistrate's ruling.

5   Therefore, the United States District Court for the Eastern District of California has clear

6   jurisdiction.

7       **B** – This appeal is being heard in the U.S. District Court for the Eastern District of

8   California. This court has jurisdiction for the reasons given in (**A**)

9       **C** – A notice of appeal (Document 29), accompanied by two significant post-trial motions

10   (Documents 25 & 26) were filed on February 18, 2025, timely to an Order denying a motion to

11   compel discovery (Document 18) filed on February 5, 2025. My trial took place on February 6,

12   2025, so these filings were timely to its outcome, as well.

13       **D** – My case was moved from the Magistrate who presided at my bench trial to the

14   District Judge hearing this appeal. This includes the two motions previously filed (Documents 25

15   & 26) and a motion filed after the venue had changed (Document 46). As a District Judge for the

16   Eastern district of California, the Court holds jurisdiction over Magistrate decisions within that

17   district.

18

19

20

21

22

23

24

25

26

27

28

5 KINGSTON, APPELLATE BRIEF

1

## IV ISSUES PRESENTED FOR REVIEW

2

3        The single issue presented for review by this appeal is that the Closure Order #05-11-02-

4  24-05 (Hereinafter referred to as the "Rainbow Closure Order" or "Rainbow Closure") for which

5  I was cited was unlawfully promulgated. It runs afoul of our First Amendment rights to free

6  exercise of religion and freedom of expression. Additionally, it's issuance was "Arbitrary,

7  capricious, an abuse of discretion, or otherwise not in accordance with law" *5 USC § 706 (2)(a)*,

8  and "unwarranted by the facts to the extent that the facts are subject to trial de novo by the

9  reviewing court" *USC § 706(2)(f)* making it an agency action the Court must "Hold unlawful and

10  set aside" *USC § 706(2)*. As such, my conviction must be overturned.

11        Related issues include ineffective assistance of counsel, and denial of discovery

12  (Document 18), but those issues are largely addressed in motions being considered alongside this

13  appeal and so I am not seeking relief on them through this appeal. An order denying a

14  continuance requested by my trial counsel file on January 10, 2025 (Document 8) appears to have

15  been a factor in the effectiveness of my counsel. And it appears likely that the ineffective

16  assistance I received and lack of material obtained through discovery were related.

17

18

19

20

21

22

23

24

25

26

27

28

**V FACTS AND PROCEDURAL HISTORY**

1- In June of 2024, the Forest Service learned the location of the 2024 Annual Rainbow Gathering and Prayer for Peace, in Plumas National Forest near the headwaters of Indian Creek (Doc 13, P 12, L 26 thru P 13, L 3)

2- During that Rainbow Gathering, on June 20, 2024, Lassen County Supervisor, Jason Ingram, vandalized water infrastructure crucial to the Health and Safety of the event [See Document 11, P 28, Exhibit E (video footage of vandalism), Exhibit F (Exhibit 1 in this brief) and Transcript P 44, L 19-25; P 45, L 5-12; & P 46, L 9-14]

3- Further video of the vandalism was allegedly recorded that allegedly shows a local rancher named Joe Egan was present Egan allegedly said Plumas Forest Service Supervisor, Chris Carlton, "told them to do it" (Transcript P 46, L 15-20).

4- On June 25, 2024, Without preparing and "Assessment of Need and Enforcement Plan" (Hereinafter referred to as the "ANEP") or "Civil Rights Impact Analysis" (Hereinafter referred to as the "CRIA") as required by the procedures of *FSH 5309.11* (Hereinafter referred to as the "Law Enforcement Handbook), Forest Service Supervisor, Chris Carlton, citing alleged "health and safety concerns", issues Forest Closure Order # 05-11-02-24-05 (Hereinafter referred to as the "Rainbow Closure" or "Rainbow Closure Order") to take effect on June 26, 2024 [Doc 13, P2, L 7-11 (establishing time of issuance) & Doc 46, P 5, L 6-18 (establishing failure to create an ANEP or a CRIA)]

5- On July 5, 2024 and again on July 7, 2024, I am issued citations for violation of the Rainbow Closure while cleaning up the site (Document 13, P 2, L 20 thru P 3, L 2)

6- On December 23, 2024, my Attorney filed a request for a continuance- citing recent developments with the case of another client charged with Murder which "compromised defense counsel's ability to do the preparation necessary for Mr. Paul Kingston's defense" *U.S. v Kingston case no 3:24-po-181 DMC*[1] (Doc 8, P 2, L 6-21)

---

[1] This is this the docket for the citation which was disposed of in my favor at trial. Due to a clerical error, this filing

1    and that-

2         "Counsel represents additional time is necessary to request supplemental

3         discovery, confer with defendant KINGSTON, complete an independent

4         investigation, conduct and complete additional legal research including for

5         potential pre-trial motions, and prepare for trial in the event that a pretrial

6         resolution does not occur. Counsel also represents that failure to grant the

7         continuance would deny defendant reasonable time necessary for effective

8         preparation, taking into account the exercise of due diligence. *Ibid* (Doc 8, P 2, L

9         22 thru P 3, L 2)."

10   7- On January 10, 2025, the Honorable Magistrate Dennis Cota denied the continuance

11        (Doc 8²).

12   8- On January 23, 2025, my attorney filed a Motion to Compel Discovery (Doc 11).

13        While the primary purpose of the motion was the initiation of a somewhat complicated

14        "selective enforcement" defense- it also raised the issue of the substantial burden on

15        my "free exercise" rights created by the Rainbow Closure (P 5, L 7-28).

16   9- On February 5, 2025, the Honorable Magistrate Dennis Cota issued an order, denying

17        the Motion to Compel Discovery. In that order, he affirms the 2024 Annual Rainbow

18        Gathering was an "expressive" assembly, while denying that it was a "religious"

19        assembly (Doc 18, P 4 L 13-18).

20   10- On February 6, 2025, my trial was held and my July 5, 2024 citation for violation of

21        the Rainbow Closure was disposed of in my favor because "in the absence of being

22        put on notice of the closure, that there was not a violation on July 5. (Transcript P 60,

23        L 22-24)," and I was convicted for my July 7, 2024 citation because my first citation

24        qualified as "notice of the closure" for the second (Transcript P 61, L 1-8).

25   11- At my trial I testified to the connection between the Annual Rainbow Gathering and

26        my own deeply held ethical, moral, religious, and spiritual beliefs (Transcript P 47 L 3

27   ─────────────
     was not included in the docket for the citation for which I was convicted. That resulted in it being left off the record
     in the docket before the District Judge.
28   ² The order denying my motion for a continuance was transferred to my docket in the District Court.

1    thru P 51 L8 & P 52, L 24 thru P 53, L 15)

2    12- At my trial, it was determined that cellular service was unavailable to many at the

3        location of the Rainbow Gathering and cell phone use was particularly uncommon by

4        tradition at Rainbow Gatherings even when service is available (Transcript P 25, L 25

5        thru P 26, L 13 & P 36, L 15 thru P 38, L3).

6    13- At my trial, it was determined that the location of the gathering was about a mile from

7        the nearest physical posting of the Rainbow Closure (Transcript P 24, L2-8 & P 34, L

8        25 thru P 36, L 14).

9    14- At my trial, I alleged that the Rainbow Closure was the result of local opposition and a

10       campaign spearheaded by two individuals, Joe Egan (a local Rancher) and Jason

11       Ingram (a Lassen County Supervisor). Additionally, I alleged that the two of them led

12       a group to directly sabotage the Rainbow Gathering before the issuance of the

13       Rainbow Closure and that the was video documentation of Joe Egan saying Plumas

14       Forest Supervisor, Chris Carlton "told him to do that" (Transcript P 38, L4 thru P 47,

15       L1).

16   15- On February 17, 2025, acting *in propria persona* for the first time in my case, I filed a

17       timely motion for partial reconsideration of the order denying discovery, as well as a

18       timely motion for new trial due to ineffective assistance of counsel and a notice of

19       appeal (Documents 24-26 & 29).

20   16- On March 3, 2025, I was notified that my case had been transferred to a District Judge

21       as a result of my notice of appeal (Document 29)

22   17- On March 24, 2025 five defendants who had also been issued citations for violation of

23       the Rainbow Closure Order (*see respectively Oswald, Robichaud, Zirk, Resler, and*

24       *Frucher, hereinafter referred to as "Oswald, Et al"*)[3] filed motions to dismiss their

25   _____
     [3] Full individual citations-
26       *Oswald, case no 3:24-po-00137-DMC,.*
         *Frucher, case no 3:24-po-00121-DMC,*
27       *Resler, case no 3:24-po-00206-DMC,*
         *Robichaud, case no 3:24-po-00147-DMC,*
28       *Zirk, case no 3:24-po-00167-DMC*
         All cases heard in the Eastern Federal District of California.

1          charges with prejudice. Each defendant had an individual motion, and all motions

2          were joined to the motion of *Oswald* (See e.g. *Frucher* Document 17).

3     18- On April 8, 2024, The defendants in *Oswald, et al* had all charges relating to violation

4          of the Rainbow Closure dismissed with prejudice *Oswald, et al, see e.g. Oswald,* (Doc

5          22).

6     19- On April 25, I filed a motion to vacate my conviction on the grounds that the Rainbow

7          Closure was issued unlawfully, and my attorney had not been given information

8          relevant to my defense. This motion was based on facts revealed in *Oswald, et al,*

9          specifically- that the Plumas Forest had not prepared an ANEP and CRIA as required

10         by their Law Enforcement Handbook (Doc 46).

11    20- On June 6, 2025, a briefing schedule was set for the aforementioned motions and my

12         appeal.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    _____

28    "*Oswald, et al*" refers to the individual motions to dismiss, taken collectively and the Order resulting from
      those motions (See e.g. *Oswald,* Doc 22*).*

10 KINGSTON, APPELLATE BRIEF

1

2

# VI SUMMARY OF ARGUMENTS

3    My trial counsel directly stated when seeking a continuance on Dec 23, 2024, that failure

4    to grant one, "would deny defendant reasonable time necessary for effective preparation, taking

5    into account the exercise of due diligence *Kingston[4]*, (Doc 8)." In the motion based on ineffective

6    assistance, it is thoroughly documented that I was unable to keep regular and responsive contact

7    with my trial counsel (Document 26). The "alleged" video I testified about (Transcript P 38, L4

8    thru P 47, L1) was given to my attorney long before my trial, but it was not entered into any

9    record.

10    This video, various Facebook screenshots, and news article claiming Joe Egan

11    communicated with the Forest Service were all linked as evidence in a document with the title

12    "Timeline of Events" which was submitted to the U. S. Attorney's office as reverse Jencks

13    material (the video was through my Google Drive). The vast majority of this wasn't entered into

14    the record, which substantially hurt the credibility of my allegations during my trial- prejudicing

15    the outcome. Additionally, this evidence not being presented for the record weakens the case for

16    Judicial Review of the Rainbow Closure Order under *5 USC § 706 (2)(a, b, d, & f)*, although even

17    the incomplete evidence currently on record is sufficient to find that it was-

18         1- "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

19              with law *5 USC § 706 (2)(a)*."

20         2- "contrary to constitutional right, power, privilege, or immunity *5 USC § 706

21              2(b)*"

22         3- "without observance of procedure required by law *5 USC § 706 2(d)*," and

23         4- "unwarranted by the facts to the extent that the facts are subject to trial de novo

24              by the reviewing court. *5 USC § 706 2(f)*,"

25    Furthermore, the Rainbow Closure placed a substantial burden on the free exercise of

26    "religion" as viewed through *Welsh v. United States, 398 U.S. 333 (1970)* in an overbroad manner

27    without a sufficiently compelling government interest. Additionally, the Rainbow Closure fails to

28    ---
[4] See footnote 1 on why this filing isn't on the record before the District Judge.

11 KINGSTON, APPELLATE BRIEF

1    respect First Amendment rights to free expression when subjected to the analysis of *Madsen v.*

2    *Women's Health Center, Inc., 512 U.S. 753 (1994)*. As it runs afoul of the First Amendment, I

3    cannot be held liable for violation of it.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12 KINGSTON, APPELLATE BRIEF

1

# VII STANDARD OF REVIEW

2

3      I will argue that the Rainbow Closure was unlawful on three separate grounds-

4          (1) That the Rainbow Closure Order was a violation of our First Amendment right

5              to free exercise of religion.

6          (2) That it violated our First Amendment right to expressive assembly.

7          (3) That its issuance was "arbitrary, capricious, an abuse of discretion, or

8              otherwise not in accordance with the law" *5 USC § 706(2)(a)* and

9              "unwarranted by the facts to the extent that the facts are subject to trial *de novo*

10             by the reviewing court" *5 USC § 706(2)(f)*

11     With regard to (1) & (2), they are matters of law and the Court is entitled to a *de novo*

12 review.

13     With regard to the (3), it is a matter of mixed fact and law. The matter is made more

14 complicated by the introduction of evidence and arguments not heard or considered at or before

15 my trial. With that in mind, the court should adopt a *de novo* review with respect to facts relevant

16 to evidence and arguments presented after trial, while maintaining a plain error standard in the

17 review of facts unaffected by later revelations.

18

19

20

21

22

23

24

25

26

27

28

13 KINGSTON, APPELLATE BRIEF

1

2

## VII ARGUMENTS

3

4

### (A) The Rainbow Closure violated our free exercise of religion and religious assembly.

5

The "*Religious Freedom Restoration Act of 1993*" *USC § 2000bb*, states

6

"(a) Government shall not substantially burden a person's exercise of religion even if the

7

burden results from a rule of general applicability, except...(b)...only if it demonstrates that

8

application of the burden to the person-

9

(1) "is in furtherance of a compelling governmental interest;

10

"and

11

(2) "is the least restrictive means of furthering that compelling governmental

12

interest." *42 USC § 2000bb-1(a,b)*

13

And furthermore- "(c) A person whose religious exercise has been burdened in violation

14

of this section may assert that violation as a claim or defense in a judicial proceeding and obtain

15

appropriate relief against a government," *42 USC § 2000bb-1(c)*

16

Additionally, the *"Protection of Religious Exercise in Land Use and by Institutionalized*

17

*Persons Act" 42 USC § 2000cc* (hereinafter referred to as the "PRELUIPA") states

18

"No government shall impose or implement a land use regulation in a

19

manner that imposes a substantial burden on the religious exercise of a person,

20

including a <u>religious assembly</u> or institution, unless the government demonstrates

21

that imposition of the burden on that person, assembly, or institution—

22

"(A) is in furtherance of a compelling governmental interest; and

23

"(B) is the least restrictive means of furthering that compelling

24

governmental interest. *42 USC § 2000cc- 1(a)*" (emphasis added)

25

The PRELUIPA clarifies that 'religious exercise'- "includes any exercise of religion,

26

whether or not compelled by, or central to, a system of religious belief. *42 USC § 2000cc-*

27

*5(7)(a)*"

28

I shall begin by establishing that the Rainbow Gathering is a "religious assembly."

14 KINGSTON, APPELLATE BRIEF

1    In *United States v. Rainbow Family, 695 F. Supp. 294 (E.D. Tex. 1988)*, the court states:

2                    "The record fully reflects that the defendants' anticipated councils,

3            gatherings or meetings in the National Forests will involve significant expressive

4            activity. For example, individual defendants have testified that Rainbow Family

5            gatherings and councils involve exchange of views on many subjects, including

6            political topics, as well as educational seminars and various forms of worship.

7            Moreover, many of those associated with the Rainbow Family view their very

8            participation or association in such events as political statements (for example,

9            some argue for peace and the ecology, while others are in opposition to

10           hierarchical, coercive systems of government). Even the act of camping in the

11           National Forests may have political connotations and qualify as protected

12           symbolic activity. See, e.g., *U.S. v. Abney, 534 F.2d 984, 985 (D.C.Cir.1976) (per*

13           *curiam*) (sleeping in Lafayette Park in protest vigil is expressive activity); *Clark v.*

14           *Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 3069,*

15           *82 L. Ed. 2d 221 (1984)* (assuming, but not deciding, that overnight sleeping in

16           connection with demonstration is expressive conduct "protected to some extent by

17           the First Amendment"). Thus, it is unquestionable that rights of speech, worship,

18           and association, closely guarded under the First Amendment, are operative here."

19           (emphasis added).

20    While she did not reference this specific section, my trial attorney cited this opinion in her

21    discovery motion (Doc 11) stating-

22                    "U.S. Courts have already recognized Rainbow Gatherings in the United

23           States Forest Service to be an expression of religion. *United States v. Rainbow*

24           *Family, 695 F. Supp. 294 (E.D. Tex. 1988)* "It cannot be reasonably disputed that

25           Public Forest Service lands are the type of forum in which expressive activity has

26           historically occurred, and in which public expression of views must be tolerated to

27           the maximum extent"

28    This poor choice of quote helps to explain the plain error within the Honorable

15 KINGSTON, APPELLATE BRIEF

1   Magistrate's order on that motion (Doc 18), where it is stated, "Indeed, the court there concluded

2   the Rainbow Family Gathering was *expressive*, nothing to do with religion. Rainbow Family at

3   308."

4        In fairness, while the Rainbow Family Gathering is a "Prayer for Peace," there is not a

5   "Rainbow religion," with a "Rainbow Bible" and a "Rainbow Pope." This can make it easy to

6   mistakenly conclude that because it is not the product of a single set of beliefs, it cannot be

7   considered an exercise of religious beliefs.

8        But as the Supreme Court points out in *Welsh*, religious beliefs "need not be confined in

9   either source or content to traditional or parochial concepts of religion." As *Welsh* explains, all

10  that is required for a belief to be "religious" in the constitutional sense is that it, "stem from...

11  moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held

12  with the strength of traditional religious convictions."

13       To be clear, this doesn't mean simply any strongly held belief- is "religious," as free

14  exercise protection is not extended to a belief that "rests solely upon considerations of policy,

15  pragmatism, or expediency. *Ibid.*" It also is important to note that this does not mean any belief

16  with a "substantial political dimension *Ibid*" fails to qualify as "religious". Rather a belief must be

17  "not deeply held," and "not rest at all upon moral, ethical, or religious principle *Ibid* (emphasis

18  added)" in order to be excluded from "free exercise" protections.

19       With respect to the 'Prayer for Peace' which is the focus of the Rainbow Gathering- for

20  many participants (including myself), the fact that it is "not confined in either source or content to

21  traditional or parochial concepts of religion, *Ibid.*" but rather an invitation for each individual to

22  'pray for peace' according to their own "moral, ethical, or religious beliefs about what is right and

23  wrong *Ibid.*" is precisely what makes it sacred. As I explained at my trial-

24             "...that's kind of the big tradition of -- the big point, the whole point of the

25             gathering is it's a prayer for peace. And, like, and it's not like -- it's not like a

26             Christian prayer or a Muslim prayer or a Jewish prayer. Like, it's however you

27             choose to practice your spirituality, come and pray with us for peace." (Transcript

28             P 50, L10-15)

16 KINGSTON, APPELLATE BRIEF

1     Three of the five defendants in *Oswald, et al* included violation of the free exercise of

2   their religious beliefs in their respective motions to dismiss[5]. Clearly, some significant portion of

3   participants in the "assembly" that is the Rainbow Gathering come to it for the purpose of

4   "religious exercise." Despite the fact that the Rainbow Gathering is "not compelled by, or central

5   to, a system of religious belief. *42 USC § 2000cc- 5(7)(a)*," or at least not a single, overarching

6   "system of religious belief," it is undeniably a "religious assembly" in the sense of "religion"

7   established by the Supreme Court in *Welsh*.

8     But even if the Rainbow Gathering and Prayer for Peace is not to be considered a

9   "religious assembly"- there remains the fact that <u>my</u> participation in the event constitutes <u>my</u>

10  "free exercise" of <u>my</u> deeply held spiritual, moral, ethical, and religious beliefs.

11    At my trial, I was asked, "What was the purpose for you being at the Rainbow Gathering

12  on this particular occasion in July of 2024?" (Transcript P49 L25 thru P50 L1) and my immediate

13  response was- "So, like, for me, personally, the purpose was, I guess, like my, I guess you would

14  call it prayer for peace is to serve other people at this gathering," As I elaborated on this, I came

15  back to my belief in prayer as service-

16          "And to me, a lot of my ideas about prayer are acts of service. And so that

17      generally tends to be more how I like to pray for peace at the gathering." (Transcript P50

18      L16-18)

19    And I concluded- "The Gathering allows me to follow my ideas of, like, God by trying to

20  plenty be of service to other people." (Transcript P51 L5-6)

21    Prior to that, when asked, "Now, what was your role at the gathering?" (Transcript P47

22  L3)- I explained, "So, I guess there's kind of two things I tend to - I like to do at the gathering."

23  (Transcript P47 L4), after describing my efforts to ensure there is of safe filtered water available

24  (the first of those "two things"), I continued, "And then when it's all done, my other kind of role

25  has been helping to clean up the woods and mitigate the impact." (Transcript P47 L20-21). I

26  explained in significant detail the efforts involved in "clean-up," as well as expressed regret that-

27  _____
[5] See *Oswald, case no 3:24-po-00147-DMC*, Doc 17 (P 8, L 17 thru P 10, L 27 and P 13, L 24 thru P14, L 3);
*Frucher, case no 3:24-po-00121-DMC*, Doc 16 (P 6, L6 thru P 9, L13); and *Robichaud, case no 3:24-po-00147-*
28  *DMC*, Doc 16 (P 8, L 14 thru P 9, L9)

1   because of the citations received for the Rainbow Closure- the task had not been completed to my

2   usual standard. (Transcript P47 L22 thru P49 L3).

3       During cross-examination, the A.U.S.A. made no effort to challenge the sincerity of any

4   of my professed beliefs in relation to the gathering, nor did they question whether or not those

5   beliefs truly "deeply held," or if the were based "solely on considerations of policy, pragmatism,

6   or expedience."

7       On re-direct, my counsel asked, "Mr. Kingston, why did you not leave immediately after

8   receiving the second citation? Why did you not leave immediately after the second one?"

9   (Transcript, P 52 L24 thru P 53 L1).

10      "Because the woods weren't fully clean," (Transcript, P 53 L2) I answered, "There was

11  about a U-Haul's worth of trash at least that would have to get out of the woods before I would

12  feel comfortable leaving." (Transcript, P 53 L 5-7). And I finished my testimony- "But it was(n't)

13  until we had all this stuff out, I felt like I still had to be cleaning the site and, you know, making

14  sure that we weren't leaving behind a mess." (Transcript, P 53 L11-14).

15      While I did not use the exact words of *Welsh*, it is clear from this testimony that I see my

16  participation in the Annual Rainbow Gather through "acts of service," (Transcript, P 50, L 16-17)

17  particularly through the act of "helping to clean up the woods"(Transcript, P 47, L 21)  as the

18  exercise of my sincerely held "moral, ethical, or religious beliefs" *Welsh.* After all, service and

19  environmental responsibilities are certainly moral and ethical concepts. And if my willingness to

20  challenge a \$250 fine, despite the significantly greater economic, mental, and emotional strain on

21  my situation created by mounting such a challenge isn't sufficient evidence that my beliefs-

22  particularly my beliefs with respect to the Annual Rainbow Gathering- are "held with the strength

23  of traditional religious convictions" *Welsh*, then I'm not sure what evidence could be considered

24  sufficient.

25      From this, the conclusion that the Rainbow Closure placed a "substantial burden" on my

26  "exercise of religion," is inescapable. Which means for it to be a lawful order under the *Religious*

27  *Freedom Restoration Act*, it must be demonstrated that it (1) "is in furtherance of a compelling

28  governmental interest" and (2) (1)    "is the least restrictive means of furthering that compelling

1    governmental interest." *42 USC § 2000bb-1(b)*. Let's turn to the government's case that this order

2    served a "compelling government interest" and was the "least restrictive means" of advancing

3    that interest.

4         At the trial, my attorney asked the only witness for the government, Officer Luke Dalton,

5    "Now, with respect to why this closure order happened, do you have any information as to the

6    reason that this closure order was even made? (Transcript P 27, L 3-5)"

7         His response was, "That's above my pay grade. (Transcript, P 27, L 8)"

8         To make his answer clear, she continued, "Okay. So you don't have any information

9    yourself as to any health or safety issues that were the source of this order. Is that correct?

10   (Transcript, P 27, L 10-12)." Officer Luke Dalton replied, "Again, above my pay grade for that.

11   (Transcript, P27 L 13)." And it was confirmed that the government's only witness had no

12   knowledge of any "compelling government interest" for the issuance of the Rainbow Closure.

13        Instead, we must examine the trial brief submitted by the government. It lists the

14   following "concerns" which allegedly led to the Plumas Forest Service issuing the Rainbow

15   Closure- the event's "(1) presence next to a road used for a busy logging operation, (2) their

16   digging of slit trenches for disposal of human waste," being "in a region at (3) high risk of

17   wildfire impact, and (4) on a site sacred to local tribes," as well as the " (5) trampling of pasture

18   and diversion of water used by permitted livestock. [Doc 3, P 2, L 3-6 (enumeration added)]"

19        Addressing these concerns, one by one-

20

21        (1) "presence next to a road used for a busy logging operation"-

22             There were at least three different roads leading into the gathering location (See

23             Exhibit A), whichever of those roads had a "busy logging operation" on it could easily

24             have been closed to non-logging traffic while Gathering participants came in via an

25             alternate route. The Rainbow Closure was clearly overbroad and not the "least

26             restrictive means" of addressing the concern of interference.

27

28        (2) "their digging of slit trenches for disposal of human waste"-

1    These are latrines, and this has been a standard practice for almost the entire

2    history of Rainbow Gatherings- note they are mentioned in 6 of the 8 "clean-up

3    approval" letters included in the earlier motion I filed seeking a new trial due to

4    ineffective assistance of counsel (Document 26, P 63-P73). They're consistently

5    located more than two hundred feet from water. I've seen no indication of problems

6    with this practice in any previous Rainbow Gathering, and as I testified under oath-

7    "In both New Hampshire (2023) and Colorado (2022), I actually even had the pleasure

8    of working with Forest Service Resource People during the cleanup process to kind of

9    help them communicate with those of us who were doing cleanup and facilitate

10    cooperation between us to ensure they were happy with our cleanup." (Transcript P 48

11    L1-6)- so it is likely I would have been informed if the practice needed to change.

12    Trench latrines are a regular practice of groups like the Boy Scouts of America (See

13    Exhibit B). Frankly, this concern is completely spurious.

14    But even if there is some genuine concern, for whatever reason, with our

15    practice of digging trench latrines- the Rainbow Closure only served to aggravate

16    the issue. As I testified, to my personal shame- "they saw a latrine that because I

17    was rushing to get out on the 10th in order to avoid getting a citation on the 11th, I

18    neglected to actually bury and mound and make sure." (Transcript P48 L18-21).

19    Were it not for myself and many other individuals who were cited for violation of

20    the Rainbow Closure, there would have been multiple open latrines left behind,

21    rather than just the one.

22

23    (3) "Being in a region at high risk of wildfire impact"-

24    Fire danger is a very serious concern, particularly within California during the

25    months of June and July. But as the Supreme Court has stated in *Tinker v. Des Moines*

26    *Independent Community School District, 393 U.S. 503 (1969),* "in our system,

27    undifferentiated fear or apprehension of disturbance is not enough to overcome the

28    right to freedom of expression. This despite the fact that- "the Court has repeatedly

1     emphasized the need for affirming the comprehensive authority of the States and of

2     school officials, consistent with fundamental constitutional safeguards, to prescribe

3     and control conduct in the schools" *Ibid.*

4          And as the Ninth Circuit found- "enjoining or preventing First Amendment

5     activities before demonstrators have acted illegally or before the demonstration poses

6     a clear and present danger is presumptively a First Amendment violation" *Collins V.*

7     *Jordan, 110 F.3d 1363 (9th Cir. 1997)*.

8          Additionally, the Forest Service already had narrowly tailored means to mitigate

9     fire danger. For example, the "Stage 1 fire restrictions" which went into effect on June

10    23, 2024, which prohibited the "attending or using a fire, campfire, or stove fire,

11    except in designated recreation areas" [Document 11, P 25, Exhibit D (Exhibit 2 in

12    this brief)]

13         Finally, in an internal memo, Chris Carlton (the Forest Supervisor who issued the

14    closure) acknowledges that "fuel conditions are not so critical in the immediate

15    vicinity of the incident" [Document 11, P 14-16, Exhibit A (Exhibit 3 in this brief)],

16    meaning that- if anything, the site was one of the lower risk regions of wildfire impact

17    within the Plumas National Forest.

18

19    (4) "on a site sacred to local tribes"-

20         In the government's trial brief, it is stated both logging and grazing activity were

21    going to take place on or around the site (Document 13). And I just don't understand

22    how a site that isn't too sacred for logging and cattle grazing can still be too sacred for

23    a "prayer for peace" to take place on it. I recognize that there may be culturally

24    sensitive areas, which may need to be flagged off (as has happened many times at

25    previous Rainbow Gatherings)- but if the entire zone held significant traditional value,

26    then it stands to reason it wouldn't be eligible for such aggressive development.

27

28    (5) "trampling of pasture and diversion of water used by permitted livestock"-

1              The total area occupied by the 2024 Annual Rainbow Gathering was a little under

2      half of a square mile or 320 acres, while The Forest Service claims it's "footprint" is a

3      little over twice that size (Exhibit A). According to a 1993 report by the Government

4      Accountability Office titled *Rangeland Management: Profile of the Forest Service's*

5      *Grazing Permit's and Allotments*- (See Authorities), it was reported that the average

6      size of grazing allotments for all Western National Forests[6] is 10,591 acres. The

7      details of the grazing allotment The Rainbow Gathering allegedly interfered with were

8      never put on the record, so it seems reasonable to assume it was about that size- which

9      would indicate that the Rainbow Gathering probably took up about 3% of the total

10     "pasture" which the participants were "trampling."

11             As described above, I testified that, "I really care about making sure people have

12     healthy, filtered drinking water." (Transcript P 47 L5-6). Because of this involvement

13     with ensuring access to water, I know that the tributaries (which are so small, they

14     aren't even marked on the map) included with the closure order. (Exhibit A) our water

15     came from had no significant decrease in flow due to being diverted for the provision

16     of healthy drinking water to Rainbow Gathering participants.

17

18     Now admittedly, when listed altogether, the shear quantity of "concerns" can make them

19     appear "compelling," but once closer scrutiny is applied- it becomes clear that there were already

20     means to address these concerns available to the Forest Service, such as enforcement of already

21     existing restrictions, marking off sensitive areas, and/ or a more narrowly tailored road closure.

22     What's more, as the aforementioned "clean-up letters" (Document 26, P 63-P73) illustrate, these

23     types of concerns have been addressed to the complete satisfaction of the local Forest Service

24     staff, and as I testified in trial, "there's been 50-some-odd years of gatherings where there hasn't

25     been the necessity of issuing a closure order." (Transcript P 41, L 12-14). Even if one were to

26     grant that the sum total these "concerns" amount to a "compelling governmental interest," a

27

28     ---
       [6] As explained in the report's introduction, they only provided information on the Forest Service's 6 Western
       Regions which account for 97% of the Forest Service's total "Animal Months" (AMs)

1    sweeping closure that targets the entire event is clearly not the "least restrictive means" of

2    furthering those interests.

3         Based on the record, the only conclusion is that the Rainbow Closure placed an excessive

4    burden on the free exercise of my deeply held beliefs, without a compelling governmental interest

5    to further, in an overly broad and restrictive manner. Therefore, it ran afoul of the First

6    Amendment, as well as the *Religious Freedom Restoration Act* and was therefore an unlawful

7    Order.

8

9         **(B) The Rainbow Closure violated our First Amendment right to expressive**

10                                    **assembly.**

11

12        While the Honorable Magistrate failed to recognize the "Annual Rainbow Gathering and

13   Prayer for Peace" as a religious exercise- it is undisputed on the record that The Annual Rainbow

14   Gathering constitutes an expressive event (Document 18, cited above).

15        With respect to the Rainbow Closure- the analysis of *Madsen* is proper.

16        In much the same way that "injunctions carry greater risk of censorship and

17   discriminatory application than do general ordinances" *Madsen*, a Forest Closure can and has

18   been used to unconstitutionally target expressive activity [*See e.g. United States v Aglialoro, et al,*

19   *2001 WL 209912, (D. Or. 2001)*, or *U.S. v White, case no: 3:96-cr-05177-JKA-1, (W,D, Wa.*

20   *1996)*]. But whereas injunctions can be "tailored by a trial judge to offer more precise relief"

21   *Madsen*, a Forest Closure Order is "tailored" only by the issuing officer and whatever

22   administrative procedures are required for its issuance- a process which is clearly less "precise"

23   than the deliberations of a trial judge, as well as one for which the record of this tailoring is

24   significantly less open. As such, when evaluating the Rainbow Closure, the court must "require a

25   somewhat more stringent application of general First Amendment Principles," specifically, that it

26   "burden no more speech than necessary to serve a significant government interest" *Madsen*.

27        *Madsen* concerns an injunction filed against pro-life protestors who regularly picketed

28   abortion clinic in Melbourne, FL. These protestors proved so disruptive that they had already

23 KINGSTON, APPELLATE BRIEF

1  been enjoined from "blocking or interfering with public access to the clinic, and from physically
2  abusing persons entering or leaving the clinic." *Ibid.* The Court found that six months after this
3  initial injunction, the protestors "continued to impede access to the clinic," and that because of
4  these protests, patients "manifested a higher level of anxiety and hypertension," as well as
5  "causing stress in the patients both during surgical procedures and while recuperating in the
6  recovery rooms," *Ibid.* What's more, these protestors didn't even confine themselves to merely
7  harassing patients going into the clinic, they expanded their protests to the residences of clinic
8  employees. In these protests, they-

9           "picketed in front of clinic employees' residences; shouted at passersby;
10          rang the doorbells of neighbors and provided literature identifying the particular
11          clinic employee as a 'baby killer.' Occasionally, the protesters would confront
12          minor children of clinic employees who were home alone." *Madsen*

13 Despite these clear threats to "the health, safety and rights of women in Brevard and
14 Seminole County, Florida and surrounding counties seeking access to [medical and counseling]
15 services." *Madsen (citing record)*, it was still ruled that a both a 300 ft buffer zone around the
16 clinic itself and a 300-ft buffer around the residences of employees "sweep more broadly than
17 necessary to accomplish the permissible goals of the injunction." *Madsen* and these restrictions
18 were struck down.

19 In contrast to the protest activity outside an active clinic in the city of Melbourne, FL- the
20 Annual Rainbow gathering was held in National Forest, far from any major population center.
21 While *Madsen* involves protestors who already had to be enjoined from "abusing persons entering
22 or leaving the clinic," the totality of the government's reasoning for the Rainbow Closure is based
23 on speculative "concerns" about "public health, safety, and environmental consequences arising
24 from this mass gathering" (Document 13). In *Madsen*, a 300 ft buffer zone was struck down,
25 because it was too restrictive of protestors who'd already confronted minor children in their
26 homes. The Rainbow Closure encompassed an area just over twenty square miles (Exhibit A),
27 and it was issued because "an unauthorized group- numbering in the hundreds, but projected to
28 reach the thousands" (Document 13) was gathered for expressive purposes.

1    As *Madsen* demonstrates, the Rainbow Closure was overbroad and too restrictive in its

2    regulation of an expressive assembly, and it was therefore a clear violation of our First

3    Amendment rights to assemble for expressive purposes.

4

5    **(C) The Rainbow Closure was unlawful under the standards set forth in *5 USC 706***

6    ***(2)(a, b, d, & f)***

7

8    *5 USC § 706* states:

9                 "To the extent necessary to decision and when presented, the reviewing

10               court shall decide all relevant questions of law, interpret constitutional and

11               statutory provisions, and determine the meaning or applicability of the terms of an

12               agency action. The reviewing court shall—

13                      "....

14                      "2- hold unlawful and set aside agency action, findings, and

15                      conclusions found to be—

16                             "(A) Arbitrary, capricious, an abuse of discretion, or

17                             otherwise not in accordance with law;

18                             "(B) contrary to constitutional right, power, privilege, or

19                             immunity;

20                             "(C) ....

21                             "(D) without observance of procedure required by law;

22                             "(E) ....

23                             "(F) unwarranted by the facts to the extent that the facts are

24                             subject to trial de novo by the reviewing court."

25    According to the Supreme Court in *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*

26    *Automobile Ins. Co., 463 U.S. 29 (1983)*-

27                 "Normally, an agency rule would be arbitrary and capricious if the agency

28               has relied on factors which Congress has not intended it to consider, entirely failed

1                  to consider an important aspect of the problem, offered an explanation for its

2                  decision that runs counter to the evidence before the agency, or is so implausible

3                  that it could not be ascribed to a difference in view or the product of agency

4                  expertise."

5        When taken in its best light, the reasoning for it can be described as a closure due to

6 overcrowding. Take away the fear that the attendance was "projected to reach thousands"

7 (Document 13, P 2, L1), and none of the purported concerns which prompted its issuance

8 continue to hold. I know of no Congressional Act or Statute which demonstrates any intention

9 that National Forests be protected against too many campers. There is absolutely nothing that has

10 been presented by the government showing that Plumas Forest Supervisor Chris Carlton gave any

11 consideration to the fact that driving hundreds of Rainbow Gathering participants from

12 entrenched camps would result in "Two U-Hauls" worth of trash and abandoned belongings being

13 left behind when deliberating on the issuance of the Rainbow Closure (Transcript P 53, L 2-7).

14        In Memo 1950 [Document 11, P 13-15, "Exhibit A" (Exhibit 3 in this brief) ], which is

15 literally the entirety of the procedural justification presented to the court for the Rainbow

16 Closure,[7] Chris Carlton cites numerous environmental concerns for issuing the Rainbow Closure

17 Order, while also stating that there is no need for an "Environmental Impact Statement (EIS) or

18 Environmental Assessment (EA) under the National Environmental Policy Act." (Document 11, P

19 13-15, part of "Exhibit A" (Exhibit 3 in this brief)].

20        Based on the analysis of *Motor Vehicle mfrs.*, there are multiple grounds for finding the

21 Rainbow Closure Order "arbitrary and capricious" under *5 USC § 706(2)(a)*. It relies on factors

22 not intended by Congress. It failed not just to consider any of its ramifications for suppressing

23 expressive activity- but also to consider very practical matters related to its impact. And it offers

24 contradictory premises for its issuance.

25        My arguments above readily demonstrate that the Rainbow Closure was "contrary to

---

26    [7] Incidentally, this was not presented to me or my attorney by the Government, nor was it ever turned over to my
27 counsel during discovery (See Document 11, P 1, L 27-28). I only had access to it because a similarly situated defendant, Karin Zirk, shared it with me. This was part of a clear pattern where my counsel, whether through lack of available time to pursue discovery or through some error on the part of the government was unable to affectively
28 represent my interest in this case.

1    constitutional right, power, privilege, or immunity;" *5 USC § 706(2)(b)*, and my motion to vacate

2    (Document 46) being heard concurrent to this appeal addresses that it was issued "without

3    observance of procedure required by law;" so I will not repeat those arguments here.

4          Which leaves *5 USC § 706(2)(f)*, which states that agency action which is "unwarranted

5    by the facts to the extent that the facts are subject to trial de novo by the reviewing court" shall be

6    set aside. And with respect to the Rainbow Closure Order, the facts are in dispute (Transcript, P

7    38, L 4 thru P 47, L 1).

8          While the video of Joe Egan allegedly stating Plumas Forest Supervisor "told him to do

9    that," as he and Lassen County Supervisor to attempted to sabotage of the Annual Rainbow

10   Gathering (Transcript, P 46, L 15-20), was not put on the record- Chris Carlton's memo directly

11   names Joe Egan's cattle interest as part of the reason for the issuance of the closure- speculating

12   that the Rainbow Gathering could cause "reduced market rate," which "may cost (Joe Egan)

13   between \$35,000 and \$70,000 in sales revenue." [Document 11, P 14, Exhibit A (Exhibit 3 in this

14   brief)]. Taken in conjunction with the Facebook post of Lassen County Supervisor- who also

15   publicly admitted to destroying water line and proudly proclaimed he would do so again

16   [Document 11, P 28, Exhibit F (Exhibit 1 in this brief)]- and the one which I read into the record

17   at my trial that proudly stating that his campaign "...had a huge impact on this decision (to issue

18   the Rainbow Closure)." (Transcript, P 42, L 17-19).

19         In that post, Ingram also celebrated that "This is the first Rainbow Gathering event to be

20   shut down. And you all had a hand in that." (Transcript, P 42, L 19-20), and gave "Big Kudos to

21   Joe Egan especially, for being one of the few willing to put himself on the front lines."

22   (Transcript P 43, L 15-17).

23         Additionally, I read a Facebook post made before the closure by Joe Egan into the record,

24   lamenting that-

25                       "Unfortunately, at this point, we have not been able to convince the USFS

26             to fulfil their mission or enforce their own policies and regulations, and we have

27             run out of time to prevent the Rainbow disaster." (Transcript, P 42, L 2-5).

28         When taken together, it starts to appear that the facts are a rancher and a politician did a

1   little rabble rousing and pulled a few strings to "prevent the Rainbow disaster." And such facts
2   don't warrant the closure of a public forum.

3       In fairness, with only the limited evidence which was presented within the limited
4   timeframe under which my counsel had to work- this is only a "smoking gun," and not a one
5   hundred percent ironclad case. But it is sufficient to cause reasonable doubt that the Rainbow
6   Closure was lawfully issued.

7       And given all the circumstances- even just as a hypothetical- it provides a convincing case
8   that a system which can allow a single memo- written by person with a clear conflict of interest-
9   to justify the shutting down of an expressive assembly is much too ripe for abuse and cannot be
10  allowed in a free society.

11      So in consideration of all the inconsistencies and unanswered questions there are within
12  the reasons given by the government for the issuance of the Rainbow Closure- The only
13  conclusion is that through the lens of *5 USC § 706(2)*, it was unlawful and must be set aside.

14

15                    **CONCLUSION AND RELIEF SOUGHT**

16

17      As has been thoroughly demonstrated, the Rainbow Closure Order was in violation of our
18  First Amendment rights to both free exercise of religion and freedom of expression. Furthermore,
19  its issuance was arbitrary, capricious, an abuse of discretion, and unwarranted by the facts.

20      As such, my conviction must be vacated and overturned.

21

22                              Respectfully submitted,

23      Paul Kingston,
24      x PAUL KINGSTON
25      Date: August 21, 2025
26

27

28

1  Paul Kingston, appearing in *propria persona*

2  11 Silvercreek Ln, Ballwin, MO 63011

3  Phone: (314)601-4662

4  E-mail: Picasso.dilly@gmail.com

5

6

7

8  **UNITED STATES DISTRICT COURT**

9  **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  ,United States of America | **Case Nos.** U.S. District - 2:25-cr-00047-DC |
| 12  Plaintiff, | Magistrate – 3:24-po-00182-DMC |
| 13  v. | APPELLATE BRIEF: EXHIBITS, AND AUTHORITIES NOT IN REPORTER |
| 14  ,Paul Kingston | Hearing Date: TBD under the Honorable District Judge Dena M Coggins |
| 15  Defendant. | |
| 16 | |
| 17 | |

18

19  Exhibits to Brief

20  Exhibit A: Map of Closure Area and alleged "Footprint" of gathering with area occupied by gathering participants drawn on.

21  Exhibit B: "USSSP: BSA Low-Impact and No Trace Camping and Hiking" Printed from US Scouting Service Project website

22

23

24  Exhibits from record

25  Exhibit 1: (Exhibit F from Document 11- "MOTION TO COMPEL DISCOVERY

26  MATERIAL IN SUPPORT OF SELECTIVE PROSECUTION CLAIM")- Facebook post by

27  Lassen County District 5 Supervisor, Jason Ingram admitting to vandalizing water infrastructure

28

APPELLATE BRIEF: Exhibits, and Authorities not in reporter

1   at the 2024 Annual Rainbow Gathering

2         Exhibit 2: ("Exhibit D" From Document 11: "MOTION TO COMPEL DISCOVERY

3   MATERIAL IN SUPPORT OF SELECTIVE PROSECUTION CLAIM")- Forest Service update

4   on the 2024 Annual Rainbow Gathering and its Closure.

5         Exhibit 3: (Part of "Exhibit A" From Document 11: "MOTION TO COMPEL

6   DISCOVERY MATERIAL IN SUPPORT OF SELECTIVE PROSECUTION CLAIM")- Memo

7   1950 written by Chris Carlton to justify the Rainbow Closure Order.

8

9         Authorities not in reporter

10      *United States v Aglialoro, et al, 2001 WL 209912, (D. Or. 2001)*

11      *U.S. v White, case no: 3:96-cr-05177-JKA-1, (W,D, Wa. 1996)*

12      Government Accountability Office: *Rangeland Management: Profile of the Forest*

13  *Service's Grazing Permit's and Allotments (1993)*

14      National Forest Service: Forest Service Handbook "Law Enforcement Handbook" *FSH*

15  *5309.11, Chapter 30* (abridged)

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**map of closure area, including disputed gathering area**



# EXHIBIT B

**"USSSP: BSA Low-Impact and No Trace Camping and Hiking"**

**Printed from US Scouting Service Project website**

🎥 Read Our Blog    🎥 Find Scout Sites    📘 Follow Us On Facebook    🐦 Tweet This Page    🐝 Go To BSA Site



| **Advancement** | **Ask Andy** | **Awards** | **Baloo's Bugle** | **Camps** |
| **Chaplains** | **Clipart** | **Cubmasters** | **E-mail Lists** | **Forums** |
| **Jamborees** | **International** | **MacScouter** | **Merit Badges** | **NetCommissoner** |
| **Scouts-L** | **Scoutmasters** | **USscouts.org** | **USSSP Blog** | **Venturing** |

## Craft Adventures Start Here

Kid-approved DIY Felt Kits for Scouts,
homeschoolers, and creative families.

**Become A Sponsor**    |    **Why Ads**

# Low-Impact and No-Trace Camping & Hiking

*As an American, I Will Do My Best to:*
*Be clean in my outdoor manners.*
*Be careful with fire.*
*Be considerate in the outdoors.*
*Be conservation-minded.*

-- The Outdoor Code

Back-country areas are places to seek solitude and a "wilderness experience" away from crowds, noise, and daily pressures of life. By using Leave No Trace skills, trail users can reduce their impact on the diverse, fragile, and spectacular areas in our country. The following are guidelines that will assist trail users in successfully enjoying the American wilderness.

*Leave only footprints*
*Take only memories*

# *Seven Keys to Low-Impact and No-Trace Camping*

## Pretrip Plans

- Wear a uniform or other clothing that will blend into your surroundings.
- Obtain as much information as possible before venturing out. This includes topographic maps, recreation maps, information sheets, and guidebooks.
- Learn about regulations and restrictions of the area prior to traveling.
- Avoid popular areas during times of high use.

- Select areas that are right for your activities.
- Plan 12 or fewer in your group or patrol.
- Check ahead to see if the area can accommodate and/or will allow your group size.
- Repackage food into lightweight containers that can easily be carried out with you.
- Be prepared to filter or boil all water during your trip.
- Leave a detailed itinerary with someone prior to venturing out.
- Take along trash bags and use them.

# Travel

- Stay on designated trails and avoid any cross-country travel.
- If unavoidable, select hard ground or snow for cross-country travel.
- Do not cut across switchbacks.
- Read your map carefully to avoid having to build cairns.
- When encountering equestrians, step to the downhill side of the trail and remain quiet.

# Campsites

- Use designated or already impacted campsites when appropriate.
- Choose sites free of fragile plants.
- Hide your campsite from view, out of sight of trails, streams, and lakes.
- Stay as few nights as possible in one place. Before leaving the area, naturalize it as much as possible.
- Select a campsite 200 feet or more from trails, lakes, streams, trails, and wet meadows.
- Avoid constructing structures or digging trenches.
- Do not ditch tents.

# Fires

- Use a lightweight stove for cooking rather than building a fire.
- If having a campfire, use existing fire rings instead of building new ones.
- Build fires only were appropriate, away from trees, rocks, shrubs, and meadows.
- Make sure the fire is dead out.
- Scatter the ashes and naturalize the area.
- Use only dead and down wood. Never cut green trees or bushes.
- Know the fire restrictions for the area.
- Replace sod or ground cover to erase burn scars.

# Sanitation

- Burn food scraps completely in a fire or put them in a plastic bag and carry them out.
- Pack out everything that you pack in.
- Do all washing 50 feet (about 75 steps) away from camp and water sources.
- Dig latrines 200 feet or more from camps, trails, and water sources.
- Bury sump holes and latrines when you are through with them, and restore ground cover.

# Horses and Pack Animals

- Keep groups small and carry lightweight equipment.
- Keep the number of animals to a minimum.
- Select a campsite that has enough feed for your stock.
- Keep stock 200 feet or more from lakeshores.

- Bring pellets, grain, or weed-free hay to areas where feed is limited or grazing is not allowed.
- Remove (or scatter) manure; Remove excess hay and straw.
- Use hitch lines, hobbles, and pickets to constrain pack animals. Hobble or picket in dry areas.
- Tie to sturdy trees or rope.
- Move picket pins and temporary corrals several times per day.

# Courtesy

- Hikers step off a trail to let horses pass.
- Do not pick wildflowers. Enjoy them where they are, then leave them for others to see.
- Keep noise down when you are around other campers and hikers. Personal electronic audio/video devices other than cameras are a distraction, and violate the spirit of and reason for wilderness camping; leave them at home. (Exceptions: radio to listen to weather reports and cell phone for emergencies in areas where reception is possible)
- Attempt to be as courteous to others as possible. Excessive noise, unleashed pets, and damaged surroundings distract from the quality experience in the backcountry.
- Please remember that visitors can help preserve these sites for future generations by not disturbing them in any way.

# More Information

- The national Leave no Trace program, which advocates leaving minimal impact while using an area for recreation purposes, is another good source of information. This program provides comprehensive information that can assist in achieving a stewardship ethic. For more information, contact: The National Leave No Trace Program 1-800-332-4100
- Boy Scout Handbook (#30176)

Edited by: **Bill Nelson**, Unit Commissioner, Tempe District, Grand Canyon Council, Boy Scouts of America. Please let me know of any additions or corrections.



© 1994-2024 - **U.S. Scouting Service Project** | **Site Map** | **Disclaimer** | **Project Team** | **Contact Us** | **Privacy Policy**

Materials found at **U. S. Scouting Service Project, Inc. Websites** may be reproduced and used locally by Scouting volunteers for training purposes consistent with the programs of the Boy Scouts of America (BSA), the World Organization of the Scout Movement (WOSM) or other Scouting and Guiding Organizations. No material found here may be used or reproduced for electronic redistribution or for commercial or other non-Scouting purposes without the express permission of the U. S. Scouting Service Project, Inc. (USSSP) or other copyright holders. USSSP is not affiliated with BSA or WOSM and does not speak on behalf of BSA or WOSM. Opinions expressed on these web pages are those of the web authors. You can support this website with in two ways: **Visit Our Trading Post at www.ScoutingBooks.com** or make a donation by clicking the button below.

| Make a Donation |

(U.S. Scouting Service Project Donation)

**Make a Donation**

(Ruth Lyons Memorial Donations)

# Exhibits cited from court records

**Exhibits are from record on appeal,**

**case no 2:25-cr-00047-DC**

# EXHIBIT 1

**"EXHIBIT F" FROM DOCUMENT 11: "MOTION TO COMPEL DISCOVERY
MATERIAL IN SUPPORT OF SELECTIVE PROSECUTION CLAIM"**

1:25 ◉ ◉ ◎ 🕑          ◎ 🕓 📶 📶 5G 📶 31%▬

← Replies                              Q

**Adam Buxbaum**
Jason, do you care to comment on
the vandalism you commited at the
rainbow gathering?

As a volunteer firefighter, could you
explain how slashing the first line of
defense against a fire is supposed to
keep the forest more safe?



3h    Like    Reply                1 👍

**Lassen County District 5**
**Supervisor Jason Ingram**
Adam Buxbaum sure I chopped
up the illegal water diversion
lines, and I WILL GLADLY DO IT
AGAIN! SCREENSHOT THAT!!!!

12m    Like    Reply

Replying to **Lassen County District 5 Sup...** · Cancel

Comment as Adam Buxbaum

# EXHIBIT 2

**"EXHIBIT D" FROM DOCUMENT 11: "MOTION TO COMPEL DISCOVERY MATERIAL IN SUPPORT OF SELECTIVE PROSECUTION CLAIM"**



**USDA**    **Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

Plumas National Forest | July 4, 2024

| | Plumas National Forest<br>2024 Unauthorized Group Use Incident<br>July 4, 2024 |
|---|---|
| **Situation or Background** | On June 29, the Rainbow Family moved to a new location on the Beckwourth Ranger District of the Plumas National Forest approximately 12 miles north of Beckwourth, CA. The new location is near the intersection of Forest Road 28N01 and 26N70 in an area that has been used as a fire camp in the past.<br><br>Current attendance at the new site is estimated at 1756 people.<br><br>The previous location of the Unauthorized Non-Commercial Group Use Incident was on the Mount Hough Ranger District approximately 5 miles north of Antelope Lake Recreation Area in Plumas County.<br><br>The Indian Creek Headwaters Road and Area Closure Order, Forest Order 05-11-02-24-05, remains in effect for the protection of natural, Tribal, and cultural resources, concerns about fire danger, public health and sanitation, and upholding permitted special use where the unauthorized noncommercial group use was occurring.<br><br>The initial gathering site falls within this closure area. The Forest Order is being evaluated daily to determine the appropriate time to lift the order to resume general public use of the area. Current attendance remains at approximately 75 individuals.<br><br>Many of the attendees at the initial gathering site have left although some were given additional time to remove their belongings. The Forest Service will work with local Tribes, resource staff, affected stakeholders, and the community to assess and restore the damage that occurred there.<br><br>For a map and additional information on the Rainbow Gathering Incident please visit http://www.fs.usda.gov/goto/rainbowgathering. |
| **Closures** | For public safety, the Forest has issued Forest Order 05-11-01-24-01 on June 30, 2024, to reduce the speed on Forest Road 28N01 to 15 mph from where Forest Road 28N01 intersects with Forest Road 26N70 to where Forest Roads 28N01 intersects with 25N31 on the Beckwourth Ranger District. The order went into effect July 1, 2024.<br><br>For the protection of natural resources, the following closure order remains in effect:<br>• Forest Order 05-11-02-24-05 prohibiting anyone from being in any portion of the Indian Creek Headwaters Area and Road Closure Order on the Mount Hough Ranger District.<br><br>In addition, Stage 1 Fire Restriction went into effect Monday June 24, 2024:<br>• Forest Order Number 05-11-24-01. |

USDA is an equal opportunity provider, employer and lender.

| | |
|---|---|
| **Weather**<br>**Beckwourth, CA** | Friday: Sunny, with a high near 95. Calm wind becoming west around 5 mph in the afternoon.<br><br>Friday night: Widespread haze after 1am. Mostly clear, with a low around 54. West wind around 5 mph becoming calm in the evening.<br><br>Saturday: Sunny, with a high near 98. Calm wind becoming northeast around 5 mph in the afternoon.<br><br>Saturday night: Mostly clear, with a low around 55. North wind around 5 mph becoming calm in the evening. |
| **Safety** | Please, remember that fireworks are prohibited on all National Forest System lands, including the White Mountain National Forest (Code of Federal Regulations 261.52 (b and f)).<br><br>Please keep the following in mind while driving through the woods:<br><br>• Watch for and obey posted speed limits. Forest Service roads can be narrow, rocky, and are not meant for high speeds.<br>• Beware of rocks, road washouts, downed trees and brush on the roadway.<br>• Use appropriate tires for the terrain and conditions you'll be traveling. Remember to stay on authorized roads.<br>• Carry a car kit, equipment, tools, and supplies, in case of an emergency.<br>• Always let someone know your plans and stick to those plans. |
| **Fire Restrictions** | Stage 1 fire restrictions went into effect at 12:01 a.m. Monday, June 23, based on data confirming the Energy Release Component (ERC) is above the 60th percentile and increasing, combined with drying fuels.<br><br>• Under Stage 1 restrictions, attending or using a fire, campfire or stove fire, except in a designated recreation site is prohibited.<br><br>• The order also prohibits welding, using an acetylene torch or operating any torch with an open flame within the boundaries of the Plumas National Forest.<br><br>• Possession of a valid California Campfire Permit is not an exemption from the prohibitions. However, California Campfire Permit holders can use portable campfire pits, stoves or lanterns that use gas, kerosene, jellied petroleum or pressurized liquid fuel as long as it has a working shut-off valve and is used in an area that is at least 3 feet from any flammable materials.<br><br>Forest visitors are asked to use extreme caution when fire restrictions are in place. Violations are punishable as a Class B misdemeanor by a fine of not more than $5,000 for individuals and $10,000 for organizations and/or by imprisonment for not more than six months. Fire prevention and law enforcement will be patrolling, and anyone who violates Stage 1 restrictions will be ticketed. There will be zero tolerance for violations of fire restrictions. |

| **Information** | Public Information Line at 530-638-2214 or email SM.FS.RainbowIMT@usda.gov |
|---|---|
| | Additional Rainbow Gathering Incident information can be found at http://www.fs.usda.gov/goto/rainbowgathering. |
| | **Plumas County Sheriff Department** Dial 911 for emergencies. Non-emergencies: (530) 283-6375 |
| | For more information on the Plumas National Forest, visit www.fs.usda.gov/plumas, or follow on Facebook at www.facebook.com/USFSPlumas. |
| **Protected Sites** | The Forest Service protects many sensitive resource sites. Sensitive resource areas include wildlife areas, cultural sites, riparian areas and wetlands. Restricting access to such areas provides protection for several threatened wildlife species and other aquatic and wildlife species. Excavation and/or removal of prehistoric, historic, or archaeological resources, structures, sites, artifacts, or property is prohibited. |

# EXHIBIT 3

**"MEMO 1950" FROM "EXHIBIT A" FROM DOCUMENT 11: "MOTION TO COMPEL DISCOVERY MATERIAL IN SUPPORT OF SELECTIVE PROSECUTION CLAIM"**

| USDA | United States<br>Department of<br>Agriculture | Forest<br>Service | Plumas<br>National<br>Forest | 159 Lawrence Street<br>P. O. Box 11500<br>Quincy, CA 95971-6025<br>(530) 283-2050 Voice<br>(530) 534-7984 Text (TDD) |
|---|---|---|---|---|

**File Code:** 1950                                          **Date:** June 25, 2024

**Subject:** Indian Creek Headwaters Area & Road Closure

**Forest Order No.:** 05-11-02-24-05

**To:** File

**From:** Chris Carlton, Forest Supervisor

For the protection of natural, Tribal and cultural resources, concerns about fire danger, public health and sanitation, and upholding permitted special uses, I have decided to issue a Forest Order prohibiting anyone from being in any portion of the Indian Creek Headwaters Closure Area (Closure Area) described in the Order and depicted on Exhibit A to the Order, on the Mount Hough Ranger District of the Plumas National Forest. The objectives of this Forest Order are to close the area to prevent resource degradation and social impacts within the Closure Area.

The Forest Service is concerned about the 460 plus individuals already dispersed camping within the concentrated area defined in the Order as the "Indian Creek Headwaters Closure Area," due to issues with, *inter alia*, sanitation, garbage, unauthorized campfires, and other considerations that are not compatible with maintaining public safety and the appropriate stewardship of our public lands and natural resources. I anticipate that these challenges will rapidly escalate as more and more people (up to 10,000 individuals and 1,000-2,000 vehicles – many of which are not well suited for off-highway travel) are expected to arrive in the area in the coming days.

This gathering is in violation of 36 § Code of Federal Regulations (CFR) 261.10 (k) - Use or occupancy of National Forest System land or facilities without special-use authorization when such authorization is required. USDA Forest Service regulations require that all noncommercial group use that involves 75 or more people be authorized by the Forest Service through a special use permit for noncommercial group use (36 CFR 251.54). The scope of this closure is narrowly tailored to protect the resources being impacted or at risk, while maintaining broad availability of other public lands.

The unauthorized group's presence on or near Forest Service Road No. 28N15, which is the primary access road into and out of the Closure Area, creates a high risk of accidents involving both pedestrians and vehicles. This road is the designated (and only viable) haul route for an active logging operation supporting 12-15 log truck loads per day. The logging operator has already reported individuals lying in the road and multiple vehicles coming up the hill as the log trucks descend. Additionally, the logging operator is having to maneuver around stalled vehicles with limited visibility, adding to the risk of serious injuries.

The unauthorized group uses slit trenches to dispose of human waste and digs pits for grey water disposal and compost. We anticipate there will be an estimated 35 slit trenches, 17 compost bins, and 17 grey water disposal pits. The impacts of this waste being deposited into the ground has the potential to contaminate surface waters.



Additionally, the group's unauthorized presence in the Closure Area and on the closed roads creates increased danger from potential wildfire. The impacts from significantly increased traffic in the Closure Area and on the closed National Forest System Roads will impact road conditions and can further jeopardize the safe authorized removal of fuels from this area near a community at high risk of wildfire impact. The Forest entered Stage 1 Fire Restrictions on Monday, June 25, 2024, based on data confirming the Energy Release Component (ERC) is above the 60th percentile and increasing, combined with drying fuels. This area is experiencing above normal temperatures, combined with below normal rainfall and fuel moisture levels.

As extreme fire behavior in recent years has indicated (North Complex, Beckwourth, and Dixie), a wildfire could require immediate evacuation of first responders and individuals with the unauthorized group. The access route to the site can only accommodate 20 vehicles at a time. The route is long and requires extended travel on dirt roads and are one-lane with limited passing areas.

We anticipate up to 10,000 individuals participating in this unauthorized incident based on past similar unauthorized incidents involving the same organization. While fuel conditions are not as critical in the immediate area of the incident, they are much more receptive along the primary access road at lower elevations and ignition there could also require evacuation. This could immediately jeopardize the safety of on-scene personnel. The recent Creek fire on the Sierra National Forest resulted in the immediate evacuation of over 30,000 people, 200 of whom had to be evacuated by helicopter. This current unauthorized situation is in similar terrain with similar accessibility challenges. The unauthorized group's location in the Closure Area significantly hinders ground transportation for medical emergencies. Response times could be 1-2 hours, potentially leading to complications or fatalities for those needing urgent care.

The Closure Area is in a location that is extremely popular for dispersed camping and ATV/UTV trails. Antelope Lake Recreation Area is located approximately five miles south of the incident and includes ten developed recreation sites. There are five concessionaire-operated recreation sites including one boat launch, three family campgrounds, and one group site; there are also five Forest Service-operated developed day use sites within the recreation area. The recreation area has over 200 camp sites, with approximately 65% of them on the reservation system. The campgrounds and day use sites are at full capacity on weekends and holidays in summer months, with July 4th weekend being the busiest of the year. Continued impacts to this area from the presence of the unauthorized group may result in close to $100,000 of lost revenue for the concessionaires who manage these recreation sites.

The presence of the unauthorized group is also interfering with a permitted livestock grazing operation. The Antelope Allotment is held in good standing by Joe & Dawn Egan and Richard & Holly Egan. This authorizes cattle grazing of 673 head between May 1 and November 30. Currently, 156 cow/calf pair are on the allotment, with a planned use of June 1 - October 9. The cattle depend on the same water source currently being diverted by attendees at this unauthorized incident. Their activities are diverting water from the creek utilized by the cattle and pose a risk of both water loss as well as impacts to livestock from contamination based on the expected number of attendees. Trampling of vegetation by a large group in meadows will degrade high-elevation, late-season forage crucial for cattle weight gain. The scope of significance to available forage is difficult to predict, but based on anticipated attendance, considerable impacts are expected. Water loss and/or decreased water quality can also lead to weight loss in livestock, as well as stress caused by the presence of the large crowd and subsequent traffic. Impacts of reduced market weight for these cattle may cost the permittee between $35,000-70,000 in sale revenue.

The area currently in use by the unauthorized group holds deep historical significance for the local tribes. It considered ancestral land, serving as a source of cultural and spiritual connection for the tribal communities.

ZIRK-0005

Plumas National Forest Mount Hough Ranger District personnel have evaluated the area, road conditions and evacuation routes and concluded that the area closure is necessary for public safety. This closure is needed for a duration of 19 days and will allow sufficient time for all individuals to vacate the area and remove all personal items and vehicles.

Scoping regarding this temporary closure involved discussions with local law enforcement, local Tribes, grazing permittees, firefighting agencies and other emergency responders. These entities agree with this Order to help mitigate and control the above-mentioned concerns and threats to public health and safety, impacts upon the National Foerst, and threats to private property in terms of escaped campfires and unsanitary concentrated dispersed camping near private lands.

I have concluded that this decision may be categorically excluded from documentation in an Environmental Impact Statement (EIS) or Environmental Assessment (EA) under the National Environmental Policy Act. This action falls within the category identified in 36 C.F.R. § 220.6(d)(1) - prohibitions to provide short-term resource protection or to protect public health and safety - and does not require documentation in a decision memo, decision notice, or record of decision. Pursuant to 36 C.F.R. § 215.12(f), this decision is not subject to administrative appeal. I have determined that there are no extraordinary circumstances associated with this temporary closure. Implementation of the decision may begin immediately following signature on the Order.

# AUTHORITIES NOT IN REPORTER

**(1) United States v Aglialoro, et al, 2001 WL 209912, (D. Or. 2001)**

*United States of America v. Aglialoro*, — F.Supp.2d —; 2001 WL 209912 (D.Or.2001).

2001 WL 209912
**(Cite as: 2001 WL 209912 (D.Or.))**

Only the Westlaw citation is currently available.

United States District Court, D. Oregon.

### UNITED STATES OF AMERICA, Plaintiff,
v.
### Lina AGLIALORO, Jeremy Parkin, Eric Ward, Defendants.

### Nos. F2297586, F049388, F049387, F060801, F2297585.

Feb. 14, 2001.

### ORDER

COFFIN, Magistrate J.

*1 Defendants Lina Aglialoro, Jeremy Parkin, Eric Ward, Lauren Blickle, and Jasmine Bissell have each been cited for "Being on a Road" that was subject to a United States Forest Service closure order. Defendants have moved to dismiss the citations on the grounds that the closure order is unconstitutional and was otherwise invalid because it was not properly posted in violation of the Code of Federal Regulations.

### *FACTUAL BACKGROUND*

The case concerns an old growth area in the Willamette National Forest which the Forest Service put up for sale, awarding the contract to Zip-O Lumber Company. The timber is located in what is now referenced as the Clark Timber Sale, which is near Fall Creek, Oregon, in the Middle Fork Ranger District.

In the spring of 1998, after the contract had been awarded, certain activists began to congregate in the area, occupying trees and building structures to protect the logging of old growth.

The Clark Timber Sale is criss-crossed by a series of Forest Service roads. In the early part of 1999, vandalism and damage to the roads began to escalate. Ditches were dug across roads, barricades erected, and culverts were dug up. Thus on June 28, 1999, the Willamette National Forest Supervisor signed the closure order at issue in this case. The order essentially closes all Forest Service roads in the Clark Timber Sale area until further notice. It remains in effect to this date.

Approximately one year after the closure order was entered, plaintiffs were cited for being on a closed road.

The stated purpose of the closure order is to reduce vandalism and damage to the roads. Testimony at the hearing established that protestors are allowed inside the Clark Timber Sale area itself, but are prohibited from using or accessing the road system. An exception has been crafted to the order by USFS officers, in that the practice has been to allow pedestrians to walk perpendicular directly across a road so as to avoid having to go miles out of their way using foot trails to access the other side. However, walking otherwise on the road earns the traveler a citation.

Evidence further established that:

> 1) No logging is taking place at the site, nor is any harvesting activity expected any time soon as such was enjoined by a federal court until certain endangered species surveys are completed.
> 2) Vandalism of the roads still occurs, although it has been reduced somewhat since the closure order was issued.
> 3) None of the defendants before the court was engaged in or even suspected of vandalism activity when cited for being on the road.
> 4) When a representative of the defendants went to the Willamette National Forest Supervisor's office in Eugene, Oregon on June 16, 2000, the closure order was not on file at the office and a copy had to be faxed from an outlying ranger district office.

## LEGAL ANALYSIS

It is well-settled that restrictions on time, place and manner for expressive conduct on public grounds (including areas of the national forest) must be: 1) content-neutral, 2) narrowly tailored to serve significant governmental interest, and 3) leave open ample alternatives for communication to withstand a First Amendment challenge. See: *United States v. Griefen,* 200 F.2d 1256, 1260 (9 th Cir.2000). *Griefen* likewise concerned a closure order in the national forest, which the court upheld after finding that the three-fold test was satisfied.

**\*2** Defendants distinguished *Griefen* by contrasting the more narrowly drafted closure order there with the one here. In *Griefen,* the court observed:

> The disputed area was open fully to the public and the protestors until August 7, 1996, the day the contractor requested access to begin work required by a government contract. The area was closed to enable that work to take place, work which required the use of potentially dangerous heavy construction equipment. The clear purpose of the order, as explained for the Forest Service by witnesses Wood and Murphy, was for reasons of health and safety, and for the protection of property, reasons which are authorized in § 261.53 and which hold up when tested by the rest of the record. These are compelling reasons related to needs arising from proper forest management practices, and certainly represent significant government interests. As the Supreme Court explained in Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), a restriction on expressive activity is content-neutral if it is justified, i.e., based on a non-pretextual reason divorced from the content of the message attempted to be conveyed. We

find this to be the case here. The restriction was for the specific purposes of honoring contractual obligations and permitting the safe construction of the road, not to silence the protestors. It excluded all members of the general public, not just the protestors. Moreover, the protestors had already shown by their destructive conduct that they presented a clear and present danger to the safe completion of the construction project, both to other persons as well as to themselves.

Second, as just explained, the closure order was issued to advance significant government interests. It was also narrowly tailored. The closure order was limited to the immediate construction area, and 150 feet on each side of the zone--which we conclude was imminently reasonable. The protestors were not ejected from the forest or even from the vicinity of the construction site, only from 150 feet to each side of the center of the work zone. Moreover, the restriction was not imposed until work was ready to begin, and it lasted for only 45 days, or until the project was completed.

Finally, and as we have indicated, given the spatial and temporal scope of the closure, it is clear that the protestors could continue their protest, but at a distance of 150 feet from the construction site. This tailoring left them with ample opportunities in the Nez Perce Forest and elsewhere lawfully to express their views, even though their illegal trench digging and other physically obstructive activities obviously could not continue.

*Griefen,* 200 F.3d at 1260-61.

By comparison, the Clark Timber Sale road closure order invokes no governmental interest in protecting construction activity and equipment, or in safeguarding protesters from injury from construction operations. No operations are taking place, and no equipment is at the site. And whereas the closure order in *Griefen* was tailored to cover just the area and duration of scheduled road construction activities, the Clark Timber Sale order covers the entire road system, is of indefinite duration, and is entirely disconnected from construction or logging activities.

**\*3** The government's interest here is in preventing vandalism to the road system. The rationale must be that those who occupy or visit the site to protest the Clark Timber Sale and who travel by way of the roads are more likely to damage the roads. Thus barring them from using the road system reduces the risk of vandalism of the roads, according to the government. As proof of this logic, the Forest Service relies on evidence that there has been a reduction in damage to the roads since the execution of the closure order.

But one of the first concepts learned in a Logic course is the fallacy of *post hoc ergo propter hoc* [FN1] reasoning. That vandalism [FN2] has decreased may or may not be causally related to the order. It may just as easily be speculated that damage declined because the caliber of protesters changed and some of the vandals are no longer at the scene.

> FN1. "After this, therefore because of this."
>
> FN2. Since I strayed into Latin I might also observe that the term "vandal" has its origin in the fact that the Vandals (a Germanic people) sacked Rome in 455 A.D. Were Vandals around today, they surely would object to being defined as those "who willfully or ignorantly destroy, damage, or deface property belonging to another or to the public."

The premise that protesters who travel on the road system are more likely to damage the road system than protesters who lawfully travel on the trail system throughout the area and who occupy and maintain a presence in close or immediate proximity to the roads certainly seems dubious. If some misguided criminal is bent on committing a misdemeanor (punishable by up to one year in jail) or a felony (carrying a potential of ten years) by damaging or destroying government property (if the damage exceeds $1000, the offense becomes a felony), would he or she be deterred from this sort of misconduct by a road closure order, carrying with it significantly lesser sanctions?

The fit between the closure order and the harm it is intended to address is not a good one. But even if it were better, the First Amendment issues presented would trump the interests of the government in preventing property damage through the mechanism of this blanket road closure.

In *Collins v. Jordan,* 110 F.3d 1363 (9 th Cir.1997), the court noted:

The law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence. There are sound reasons for this rule. Demonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate. Some of these demonstrations may become violent. The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, *see, e.g., Cox v. Louisiana,* 379 U.S. 536, 551, 85 S.Ct. 453, 462-63, 13 L.Ed.2d 471 (1965), and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure. *Kunz,* 340 U.S. at 294-95, 71 S.Ct. at 315-16. Courts have many times emphasized the importance of government's permitting the public to engage in spontaneous First Amendment activity, such as demonstrations, in response to controversial events. *E.g., NAACP Western,* 743 F.2d at 1346; *see also Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Banning or postponing legitimate expressive activity because other First Amendment activity regarding the same subject has resulted in violence deprives citizens of their right to demonstrate in a timely and effective fashion.

**\*4** *Collins,* 110 F.3d at 1372-73.

And, the court further observed:

We need not address the question of whether at some point--for example if there is widespread continuing violence that appears to be beyond the ability of the police to control--a time-limited ban on all demonstrations might be lawful. Similarly, we need not decide whether, and under what circumstances, specific, reliable information that organized violence of a serious nature is about to occur might justify a determination that a clear and present danger exists warranting the banning of a particular demonstration.

*Collins,* 110 F.3d at 1373.

The level of property damage to the road system in the Clark Timber Sale area is not nearly the level addressed by the *Collins* court and determined to be insufficient to support a ban on demonstrations. And the *Collins* decision further stated that should a sufficient showing be made of "violence beyond the ability of police to control", it would then address whether a "*time-limited* ban on all demonstrations might be lawful." *Collins,* 110 F.3d at 1373 (Emphasis added).

The absence of any time limitation whatsoever on the closure order runs afoul of *Collins* independently of the absence of the showing of the requisite level of harm which is intended to be addressed by the closure order.

The Forest Service's position can be boiled down to this: it does not have the resources to maintain a presence in the Clark Timber Sale area, and it believes it can reduce road damage by showing up intermittently and citing anyone it finds walking on the roads. A lack of resources does not justify a ban on protected speech and expressive conduct, nor does the generalized interest in reducing road damage, especially given the minimal showing here that the road closure is necessary to serve that purpose.

The Clark Timber Sale has generated protest activity, which is subject to First Amendment protection. The roads are public fora, and, like the streets and sidewalks of a city, provide the type of setting where demonstrations and expressive activity occur. This is not to say the Forest Service can never limit access to these roads when circumstances so justify. But the restriction must be content-neutral, narrowly tailored to serve significant government interests, and leave open ample alternatives for communication. Here, I find the road closure is not narrowly tailored, nor does it serve significant government interests, as explained above.

Accordingly, the defendants' motion to dismiss is granted.

In view of this ruling, I need not address defendants' alternative ground that the closure order was not posted properly.

END OF DOCUMENT

# AUTHORITIES NOT IN REPORTER

**(2) U.S. v White, case no: 3:96-cr-05177-JKA-1, (W,D, Wa. 1996)**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

```
UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,         )    No.  CR96-5177
                                 )
      v.                         )
                                 )    ORDER ON MOTION TO DISMISS:
BENJAMIN L. WHITE, JR.,          )    UNCONSTITUTIONAL CLOSURE
                                 )    ORDER
              Defendant )
                                 )
```

THIS MATTER came before the Court on defendant's Motion to
Dismiss: Unconstitutional Closure Order; and the Court having
reviewed the pleadings and files herein, including defendant's
Motion to Dismiss and the Affidavit of Benjamin White in Support
of Motions to Dismiss, the Court finds that Special Closure
Order No. 96-902-29 issued by the Forest Supervisor of the
Olympic National Forest, Quilcene Ranger District on February
12, 1996 violates the First Amendment to the United States
Constitution in that it is unconstitutionally overbroad, covers
an excessive area and burdens more speech than is necessary to
serve significant government interests and is violative of the
standard set forth in Madsen v. Women's Health Center, Inc., 512
U.S.     , 114 S.Ct. 516, 129 L.Ed. 2d 593 (1994).

IT IS THEREFORE ORDERED that Count I and Count II of the
information charging the defendant in this case are hereby
dismissed.

DATED this __[1st]__ day of [May], 1996.

_____/sg/_____
J. Kelley Arnold
United States Magistrate Judge

Presented by:

_____
Helga Kahr
Attorney for Defendant7

////////////////////////
Date: Mon, 30 Dec 1996 21:35:07 -0500
From: Orcawild@xxxxxxx
To: scottie@ooooooo
Subject: Closures
MIME-Version: 1.0

Content-ID: <0_17027_851999703@emout02.mail.aol.com.66545>
Content-type: text/plain

* * * * *

Content-ID: <0_17027_851999703@emout02.mail.aol.com.66546>
Content-type: text/plain;
    name="ORDER.CFR"
============

**Query    Reports    Utilities    Help    Log Out**

CLOSED,CONSENT

# U.S. District Court
## United States District Court for the Western District of Washington (Tacoma)
## CRIMINAL DOCKET FOR CASE #: 3:96-cr-05177-JKA-1

Case title: USA v. White                          Date Filed: 03/11/1996

Assigned to: Judge J. Kelley Arnold

### Defendant (1)

**Benjamin L White, Jr**                  represented by **Helga Kahr**
*TERMINATED: 05/01/1996*                                6007 PALATINE AVE N
                                                        SEATTLE, WA 98103
                                                        206-491-1970
                                                        Email: orcawild@aol.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

### Pending Counts                               **Disposition**

None

### Highest Offense Level (Opening)

None

### Terminated Counts                            **Disposition**

18:13-7990.P MISCELLANEOUS
GENERAL OFFENSES to wit: Count 1 -
Resist Arrest; Count 2 - Enter Area Closed       Dismissied by Court
for the Protection of Public Safety.
(1-2)

### Highest Offense Level (Terminated)

Petty Offense

### Complaints                                   **Disposition**

None

---

### Plaintiff

**United States of America**              represented by **Robert Louis Jacob London**
                                                        US ATTORNEY'S OFFICE (SEA)

700 STEWART ST
STE 5220
SEATTLE, WA 98101-1271
206-553-7970
Email: ecf-crm.usawaw@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/10/1996 | | DEFENDANT Benjamin L White Jr arrested (KAM) (Entered: 03/11/1996) |
| 03/11/1996 | 1 | PETTY INFORMATION by USA Robert Louis Jacob London. Benjamin L White (1) count(s) 1 to wit: Resist Arrest, Count 2 to wit: Enter Area Closed for the Protection of the Public Safety. (KAM) (Entered: 03/11/1996) |
| 03/11/1996 | 2 | CONSENT to proceed before Magistrate Judge on a Petty Offense by Benjamin L White Jr (KAM) (Entered: 03/11/1996) |
| 03/11/1996 | 3 | MINUTES of INITIAL/ARRAIGNMENT/DETENTION : JKA, Dep Clerk K Miller, AUSA Robb London, Def Counsel Helga Kahr, Tape # A141, USPT Diane McLuen, dft Benjamin L White Jr arraigned; NOT GUILTY plea entered; Attorney present; ; pretrial motions due by 4/1/96; trial set for 9:00 on 5/1/96 before JKA; Trial Briefs due by 4/22/96. Dft released on PR Bond. (cc: Cnsl, USMO, PTS, JKA) (KAM) (Entered: 03/11/1996) |
| 03/11/1996 | 4 | APPEARANCE BOND ( PR) by Benjamin L White Jr with standard and special condition of PT Supervision, no firearms, obey all directives of Federal Officers re: Entry or Departure on/from Federal Lands or Properties. Travel restriction amended for speaking engagements. (KAM) (Entered: 03/11/1996) |
| 03/15/1996 | 5 | ATTORNEY APPEARANCE for defendant by Helga Kahr (KAM) (Entered: 03/18/1996) |
| 03/20/1996 | 6 | MOTION to amend appearance bond by defendant (KAM) (Entered: 03/20/1996) |
| 03/20/1996 | | LODGED ORDER: re: motion to amend appearance bond by defendant [6-1] (KAM) (Entered: 03/20/1996) |
| 03/21/1996 | 7 | ORDER by Magistrate Judge J. K. Arnold GRANTING motion to amend appearance bond by defendant [6-1] (cc: counsel, PTS) (KAM) (Entered: 03/21/1996) |
| 04/01/1996 | | LODGED ORDER: Stipulation extending time for filing pretrial motions (KAM) (Entered: 04/03/1996) |
| 04/03/1996 | 8 | ORDER by Magistrate Judge J. K. Arnold GRANTING Stipulation for extension of time for filing pretrial motions ; pretrial motions due date extended to 4/11/96 for Benjamin L White Jr (cc: counsel, Judge) (KAM) (Entered: 04/03/1996) |
| 04/11/1996 | 9 | MOTION to dismiss: unconstitutional closure order by defendant - Oral Argument Requested NOTED FOR 4/19/96 (KAM) Modified on 04/16/1996 (Entered: 04/16/1996) |
| 04/11/1996 | 10 | MOTION to dismiss: unconstitutionality of salvage timber rider by defendant - Oral Argument requested NOTED FOR 4/19/96 (KAM) (Entered: 04/16/1996) |
| 04/11/1996 | 11 | AFFIDAVIT/MEMORANDUM by defendant in support of motion to dismiss: unconstitutionality of salvage timber rider by defendant - Oral Argument requested [10-1], of motion to dismiss: unconstitutional closure order by defendant - Oral Argument Requested [9-1] (KAM) (Entered: 04/16/1996) |

| 04/15/1996 | 12 | WAIVER of Appearance by defendant at pretrial hrgs. (KAM) Modified on 04/17/1996 (Entered: 04/17/1996) |
| 04/15/1996 | 13 | NOTICE by defendant of completions to citiations in motion to dismiss: Unconstitutional Closure Order (KAM) (Entered: 04/17/1996) |
| 04/15/1996 | 14 | NOTICE by defendant of completions to citations in motion to dismiss: Unconstitutionality of Salvage Timber Rider (KAM) (Entered: 04/17/1996) |
| 04/15/1996 | 15 | AFFIDAVIT OF SERVICE by defendant of affidavit [11-1] in support of motions to dismiss and motions to dismiss [10-1] [9-1] (KAM) (Entered: 04/17/1996) |
| 04/16/1996 | | LODGED ORDER: re: motion to dismiss: unconstitutional closure order by defendant - Oral Argument Requested [9-1] (KAM) (Entered: 04/18/1996) |
| 04/16/1996 | | LODGED ORDER: re: motion to dismiss: unconstitutionality of salvage timber rider by defendant - Oral Argument requested [10-1] (KAM) (Entered: 04/18/1996) |
| 04/19/1996 | 16 | MINUTE ORDER by Magistrate Judge J. K. Arnold ; oral argument re: Motions to dismiss set for 9:00 on 5/1/96 for Benjamin L White Jr; trial continued to 9:00 on 5/30/96 for Benjamin L White Jr (cc: PTS, counsel, Judge) (KAM) (Entered: 04/19/1996) |
| 04/22/1996 | 17 | MOTION to shorten time on stipulated motion to extend time to respond to Dft's Motions to dismiss [17-1] NOTED FOR 4/22/96 (KAM) (Entered: 04/22/1996) |
| 04/22/1996 | | LODGED ORDER: re: motion to shorten time on stipulated motion to extend time to respond to Dft's Motions to dismiss [17-1] (KAM) (Entered: 04/22/1996) |
| 04/23/1996 | 18 | ORDER by Magistrate Judge J. K. Arnold GRANTING motion to shorten time on stipulated motion to extend time to respond to Dft's Motions to dismiss [17-1]. Response due 4/24/96. (cc: counsel, Judge) (KAM) (Entered: 04/23/1996) |
| 04/24/1996 | 19 | RESPONSE by USA to motion to dismiss: unconstitutionality of salvage timber rider by defendant [10-1], motion to dismiss: unconstitutional closure order by defendant [9-1] (KAM) (Entered: 04/26/1996) |
| 04/26/1996 | 20 | REPLY by defendant TO RESPONSE by Govn't to motion to dismiss: unconstitutional closure order by defendant [9-1] (KAM) (Entered: 04/29/1996) |
| 04/26/1996 | 21 | REPLY by defendant TO RESPONSE by Govn't to motion to dismiss: unconstitutionality of salvage timber rider by defendant [10-1] (KAM) (Entered: 04/29/1996) |
| 04/26/1996 | 22 | REPLY Affidavit by defendant TO RESPONSE by Govn't to motion to dismiss: unconstitutionality of salvage timber rider by defendant [10-1], motion to dismiss: unconstitutional closure order by defendant [9-1] (KAM) (Entered: 04/29/1996) |
| 05/01/1996 | 23 | MINUTES of ORAL ARGUMENT : JKA, Dep Clerk A Swan, AUSA Robb London, Def Counsel Helga Kahr, Tape # A158 - A159, Govn't requests a continuance. Court denies request. Cnsl argue re: Mtn to dismiss per unconstitutional closure order. Ct GRANTS Motion. Dft's Mtn to Dismiss re: Salvage Timber Rider is deemed moot. (cc: Cnsl, JKA) (KAM) (Entered: 05/02/1996) |
| 05/01/1996 | 24 | ORDER by Magistrate Judge J. K. Arnold finding the motion to dismiss: unconstitutionality of salvage timber rider by defendant [10-1] MOOT; GRANTING motion to dismiss: unconstitutional closure order by defendant [9-1]. Counts 1-2. Dismissed by Court case terminated (cc: counsel, Judge) (KAM) (Entered: 05/02/1996) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 08/20/2025 18:13:26 | | | |
| **PACER Login:** | picassodilly | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:96-cr-05177-JKA |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# AUTHORITIES NOT IN REPORTER

**(3) Government Accountability Office: Rangeland Management: Profile of the Forest Service's Grazing Permit's and Allotments (1993)**

United States General Accounting Office

GAO

Fact Sheet for the Chairman,
Environment, Energy, and Natural
Resources Subcommittee, Committee on
Government Operations, House of
Representatives

April 1993

# RANGELAND MANAGEMENT

## Profile of the Forest Service's Grazing Allotments and Permittees





149111



**United States**
**General Accounting Office**
**Washington, D.C. 20548**

**Resources, Community, and**
**Economic Development Division**

B-248775

April 28, 1993

The Honorable Mike Synar
Chairman, Environment, Energy, and
  Natural Resources Subcommittee
Committee on Government Operations
House of Representatives

Dear Mr. Chairman:

This fact sheet responds to your February 14, 1992, request
and subsequent discussions with your office regarding
information about livestock grazing on public rangeland
managed by the Department of Agriculture's Forest Service.
Through the issuance of permits, the Forest Service allows
livestock operators to graze livestock on parcels of the
land it manages called allotments. These permits specify
the terms for livestock grazing on each allotment,
including the number and type of livestock allowed as well
as the locations and dates that grazing is permissible.
The Forest Service bills ranchers for the grazing,
measuring usage in animal months (AM).[1]

As agreed with your office, this fact sheet provides
information on (1) the number, average acreage, and average
stocking rate[2] of Forest Service allotments and (2) the
total and average number of AMs controlled by Forest
Service permittees. We grouped the allotment and permittee
information into several categories, emphasizing the 500
largest and smallest allotments and permittees. AMs
provided by the Forest Service were organized by permittee
number; therefore, in this fact sheet we refer to permittee
numbers as permittees. However, the term "permittee" as
used in this report does not accurately represent the
number of livestock operators holding Forest Service
permits because one livestock operator may hold permits

---

[1]The Forest Service defines an animal month as 1 month's use
and occupancy of the range by one weaned or adult cow with
or without calf, bull, steer, heifer, horse, burro or mule,
or five sheep or goats.

[2]The average stocking rate is the number of acres needed to
provide 1 AM.

B-248775

under more than one permittee number.  Conversely,
permittee numbers held by grazing associations may give
several operators the authority to graze livestock under
the permit.

Also, as agreed, this fact sheet provides information on
the Forest Service's six western regions (the Forest
Service's three other regions were excluded).  Grazing
permits issued for the six western regions--which encompass
15 western states[3]--cover 97 percent of the Forest
Service's total number of AMs.  Figure 1 shows the
locations of the Forest Service's six western regions.

---

[3]The 15 states within regions 1 through 6 are Arizona,
California, Colorado, Idaho, Kansas, Montana, Nebraska,
Nevada, New Mexico, North Dakota, Oregon, South Dakota,
Utah, Washington, and Wyoming.

2

B-248775

**Figure 1:  Forest Service Regions 1 Through 6**



Source:  Map prepared by GAO based on Forest Service data.

According to the most recent allotment information available from the Forest Service in late 1992 on the six western regions, we found that

-- the Forest Service was administering 8,455 allotments[4] encompassing 89.6 million acres in the 15 western states;

-- the average acreage of these allotments--10,591 acres for all six regions--varied by region, ranging from a 5,371-acre average for Region 1 allotments to a 14,773-acre average for Region 6 allotments;

-- the 500 largest allotments in the data base encompassed over 29 million acres, or about 32 percent of the total allotment acreage, and the 500 smallest allotments

---

[4]The Forest Service was concerned that allotments encompassing fewer than 2 acres might be inactive and/or vacant and should have been removed from the data base. Consequently, we analyzed only those Forest Service allotments containing 2 or more acres, reducing the original data base by 17 allotments.

3

B-248775

  encompassed 49,007 acres, or .05 percent of the total
  allotment acreage; and

-- the average number of acres required to provide 1 AM on
   these allotments was 9.7 acres overall, ranging from a
   7.2-acre average for allotments in Region 4 to an 18.5-
   acre average for Region 5 allotments.

Section 1 contains additional information on Forest Service
allotments.

According to the most recent permittee information
available from the Forest Service on these six western
regions, we found that

-- the Forest Service was administering permits held by
   8,206 permittees[5] encompassing over 9.2 million AMs in
   the 15 western states;

-- the overall average number of AMs controlled by a
   permittee was 1,127, ranging from a 557-AM average in
   Region 1 to a 1,380-AM average in Region 3; and

-- the 500 permittees in the data base with the highest
   livestock grazing levels encompassed nearly 4.5 million
   AMs, or about 48 percent of the total number of AMs, and
   the 500 permittees with the lowest livestock grazing
   levels encompassed 8,476 AMs, or .09 percent of the
   total number of AMs allowed.

Section 2 contains additional information on Forest Service
permittees.

SCOPE AND METHODOLOGY

In an earlier fact sheet,[6] we provided information on (1)
the number, average acreage, and average stocking rate of
allotments managed by the Department of the Interior's                   •

---

[5]The Forest Service was concerned that permittees with 1 AM
or less might hold inactive permits and should have been
removed from the data base. Consequently, we only analyzed
permittees with 2 or more AMs. This reduced the original
data base by 158 permittees.

[6]Rangeland Management:  Profile of the Bureau of Land
Management's Grazing Allotments and Permits (GAO/RCED-92-
213FS, June 10, 1992).

4

B-248775

Bureau of Land Management (BLM) and (2) the total and average number of animal unit months (AUM)[7] covered by BLM's grazing permits. As agreed with your office, we were to provide similar information for livestock grazing on public rangeland managed by the Forest Service. However, the data on AMs provided by the Forest Service were organized by permittee number rather than by permit. A permittee number may encompass one or more permits and thus is not comparable to a BLM grazing permit. To make this distinction clear, we refer to permittee numbers in this fact sheet as "permittees" rather than permits.

Because the Forest Service has no central data base for grazing information, headquarters officials asked officials from each forest to compile the information. A Forest Service headquarters official stated that the data we received were the most recent available. We used a data base program to summarize and analyze the Forest Service's data, but we did not attempt to verify the accuracy of the data because doing so would have been too time-consuming. We discussed our approach with officials in the Forest Service's Range Management Division in Washington, D.C., and in Region 6 in Portland, Oregon. We also discussed the facts in this fact sheet with Range Management Division officials, who generally agreed with them. Appendix I provides greater detail on the data base as well as a discussion of some of the limitations of the Forest Service's data.

- - - - -

Unless you announce its contents earlier, we plan no further distribution of this fact sheet until 30 days from the date of this letter. At that time, we will send copies to the Secretary of Agriculture and the Chief of the Forest Service. We will make copies available to others upon request.

---

[7]BLM's definition of AUM is similar to the Forest Service's definition of AM. BLM defines an AUM as the amount of forage needed to sustain one 1,000-pound cow, one horse, or five sheep for 1 month.

5

B-248775

Please contact me at (202) 512-7756 if you or your staff have any questions concerning this fact sheet. Major contributors to this fact sheet are listed in appendix II.

Sincerely yours,

James Duffus III
Director, Natural Resources
   Management Issues

6

## CONTENTS

|  |  | Page |
|---|---|---|
| **LETTER** | | 1 |
| **SECTION** | | |
| 1 | FOREST SERVICE ALLOTMENTS | 9 |
| 2 | FOREST SERVICE PERMITTEES | 16 |
| **APPENDIX** | | |
| I | THE FOREST SERVICE'S DATA BASE AND ITS LIMITATIONS | 24 |
| II | MAJOR CONTRIBUTORS TO THIS FACT SHEET | 26 |
| **TABLES** | | |
| 1.1 | Western Region Allotments With 2 or More Acres | 10 |
| 1.2 | 500 Largest Western Region Allotments | 11 |
| 1.3 | 500 Smallest Western Region Allotments With 2 or More Acres | 13 |
| 1.4 | Average Stocking Rate, by Regional Office, for Permittees With 2 or More AMs and Allotments with 2 or More Acres | 15 |
| 2.1 | All Permittees With 2 or More AMs, by Region | 17 |
| 2.2 | 500 Permittees Controlling the Largest Number of AMs | 18 |
| 2.3 | 500 Permittees, With 2 AMs or More, Controlling the Smallest Number of AMs | 20 |
| 2.4 | Western Region Grazing Permittees, by Category, With 2 or More AMs | 22 |
| **FIGURES** | | |
| 1 | Forest Service Regions 1 Through 6 | 3 |
| 1.1 | Percentage of the Western Region Allotments and Acres Encompassed by the 500, 1,000, and 2,000 Largest Allotments | 12 |

7

1.2    Percentage of Western Region Allotments
       and Acres Encompassed by the 500, 1,000
       and 2,000 Smallest Allotments With 2
       or More Acres                                    14

2.1    Percentage of Western Region Permittees
       and AMs Covered by the 500, 1,000, and
       2,000 Largest Permittees With 2 or More AMs   19

2.2    Percentage of Western Region Permittees
       and AMs Covered by the 500, 1,000, and
       and 2,000 Smallest Permittees With 2
       or More AMs                                      21

2.3    Percentage of Western Region Permittees
       and AMs, by Group, With 2 or More AMs           23

## ABBREVIATIONS

| AM  | animal month              |
|-----|---------------------------|
| AUM | animal unit month         |
| BLM | Bureau of Land Management  |
| GAO | General Accounting Office  |

8

## SECTION 1
### FOREST SERVICE ALLOTMENTS

According to the most recent information available in late 1992, the Forest Service's six western regional offices were responsible for managing 8,472 allotments. However, we restricted our analysis to allotments encompassing 2 or more acres to (1) eliminate the allotments not used by active grazing permits and (2) respond to the Forest Service's concerns that allotments encompassing 1 acre or less might be vacant and should have been removed from the data base. Eliminating these allotments reduced our data base to 8,455 allotments encompassing 89.6 million acres. We analyzed the number, acreage, and location of these allotments to determine their distribution throughout the regions. We also isolated data on the largest and smallest allotments to see how they differed from allotments of average acreage. Finally, we analyzed the average stocking rate for Forest Service land managed by each regional office to compare the land's productivity for livestock grazing in each region.

9

## OVERALL ALLOTMENT INFORMATION

As shown in table 1.1, the number of allotments located in each region, as well as the average acreage of these allotments, varied widely.  The Forest Service's Region 2 managed the most allotments, while Region 5 managed the least.  For the six western regions overall, the average allotment encompassed 10,591 acres. On average, Region 6 managed the largest allotments and Region 1 managed the smallest.

Table 1.1:  Western Region Allotments With 2 or More Acres

| Forest Service region | Number of allotments | Total acres | Average acreage |
|---|---|---|---|
| Region 1 | 1,582 | 8,496,670 | 5,371 |
| Region 2 | 2,231 | 16,347,192 | 7,327 |
| Region 3 | 1,414 | 19,227,774 | 13,598 |
| Region 4 | 1,766 | 24,248,831 | 13,731 |
| Region 5 | 680 | 9,677,801 | 14,232 |
| Region 6 | 782 | 11,552,114 | 14,773 |
| Total | 8,455 | 89,550,382 | 10,591* |

*This figure is the average for these allotments.

## THE LARGEST ALLOTMENTS

The 500 largest allotments in the data base represented 5.9 percent of the total allotments in the data base, but they encompassed about 32 percent of the total allotment acreage, or over 29 million acres. As shown in table 1.2, the 500 largest allotments averaged 58,178 acres. Region 4 managed the largest numbers of allotments and acres in this breakout, while Region 1 managed the fewest allotments and acres.

Table 1.2:   500 Largest Western Region Allotments

| Forest Service region | Number of allotments | Total acreage | Average acreage |
|---|---|---|---|
| Region 1 | 20 | 964,696 | 48,235 |
| Region 2 | 46 | 2,507,882 | 54,519 |
| Region 3 | 130 | 8,290,914 | 63,776 |
| Region 4 | 158 | 9,320,223 | 58,989 |
| Region 5 | 68 | 3,471,698 | 51,054 |
| Region 6 | 78 | 4,533,822 | 58,126 |
| Total | 500 | 29,089,235 | 58,178[a] |

[a]This figure is the average for the largest 500 allotments.

11

We also calculated the percentage of acres encompassed by the 1,000 and 2,000 largest allotments in the data base.  Figure 1.1 shows that, compared with the 500 largest allotments, these groups of allotments encompassed 48.8 percent and 69.0 percent, respectively, of the Forest Service's total allotment acreage in the western regions.

**Figure 1.1:  Percentage of the Western Region Allotments and Acres Encompassed by the 500, 1,000, and 2,000 Largest Allotments**



12

## THE SMALLEST ALLOTMENTS

The 500 smallest allotments in the data base represented 5.9 percent of the total allotments in the data base, but they encompassed .05 percent of the total allotment acreage, or 49,007 acres. As shown in table 1.3, the 500 smallest allotments averaged 98 acres. Region 1 managed the largest numbers of allotments and acres in this group, while Region 5 managed the fewest allotments and acres.

**Table 1.3: 500 Smallest Western Region Allotments With 2 or More Acres**

| Forest Service region | Number of allotments | Total acreage | Average acreage |
|-----------------------|----------------------|---------------|-----------------|
| Region 1 | 120 | 12,856 | 107 |
| Region 2 | 110 | 11,950 | 109 |
| Region 3 | 93 | 11,244 | 121 |
| Region 4 | 75 | 4,752 | 63 |
| Region 5 | 20 | 1,721 | 86 |
| Region 6 | 82 | 6,484 | 79 |
| Total | 500 | 49,007 | 98[a] |

[a]This figure is the average for the smallest 500 allotments.

13

    We also calculated the percentage of acres encompassed by the
1,000 and 2,000 smallest allotments in the data base.  As shown in
figure 1.2, compared with the 500 smallest allotments, these groups
of allotments encompassed .25 and 1.27 percent, respectively, of
the Forest Service's allotment acreage in the western regions.

Figure 1.2:  Percentage of Western Region Allotments and Acres
Encompassed by the 500, 1,000, and 2,000 Smallest Allotments With
2 or More Acres



14

## AVERAGE STOCKING RATE

We analyzed the average stocking rate on Forest Service land
in each region to compare the land's productivity for livestock
grazing. To determine the average stocking rate, we divided the
number of acres managed by each Forest Service regional office by
the number of animal months (AM) controlled by permittees under
each office. We limited this analysis to allotments with 2 or more
acres and permittees with 2 or more AMs. Table 1.4 shows that the
average stocking rate for these Forest Service allotments was 9.7
acres per AM. On average, Forest Service land managed by Region 5
needed the most acreage to provide one AM of forage, while Forest
Service land managed by Region 4 needed the least acreage.

Table 1.4: Average Stocking Rate, by Regional Office, for
Permittees With 2 or More AMs and Allotments With 2 or More Acres

| Forest Service region | Total acres | Total AMs | Average stocking rate |
|---|---|---|---|
| Region 1 | 8,496,670 | 683,986 | 12.4 |
| Region 2 | 16,347,192 | 2,200,979 | 7.4 |
| Region 3 | 19,227,774 | 1,710,111 | 11.2 |
| Region 4 | 24,248,831 | 3,351,418 | 7.2 |
| Region 5 | 9,677,801 | 522,605 | 18.5 |
| Region 6 | 11,552,114 | 780,140 | 14.8 |
| Total | 89,550,382 | 9,249,239 | 9.7ᵃ |

ᵃThis figure is the average rate for these allotments.

15

## SECTION 2
## FOREST SERVICE PERMITTEES

According to the most recent information available, the Forest
Service's six western regional offices were administering permits
held by a total of 8,364 permittees. We restricted our analysis to
those permittees using 2 or more AMs, to respond to the Forest
Service's concerns that permittees with 1 AM or less might
represent permittees that should have been removed from the data
base. Eliminating these permittees reduced the number of
permittees in our analysis to 8,206 controlling 9.2 million AMs.
We analyzed the number of permittees and the average AMs the
permittees controlled to determine their distribution throughout
the Forest Service's western regions. We also grouped the
information on permittees into several categories and isolated
information about the permittees that controlled the largest number
and the smallest number of AMs.

16

## OVERALL PERMITTEE INFORMATION

As shown in table 2.1, the regions varied widely in the number of Forest Service permittees and the average number of AMs that the permittees controlled. Region 4 had more permittees, who controlled more AMs, than any of the other western regions. However, Region 3 permittees, numbering about half as many as Region 4 permittees, controlled the largest average number of AMs in the Forest Service's western regions. Region 5 had the smallest number of permittees and AMs. However, Region 1 permittees controlled the smallest average number of AMs in these regions.

**Table 2.1:  All Permittees With 2 or More AMs, by Region**

| Forest Service region | Number of permittees | Total AMs | Average AMs |
|---|---|---|---|
| Region 1 | 1,227 | 683,986 | 557 |
| Region 2 | 1,809 | 2,200,979 | 1,217 |
| Region 3 | 1,239 | 1,710,111 | 1,380 |
| Region 4 | 2,692 | 3,351,418 | 1,245 |
| Region 5 | 608 | 522,605 | 860 |
| Region 6 | 631 | 780,140 | 1,236 |
| Total | 8,206 | 9,249,239 | 1,127[a] |

[a]This figure is the average for these permittees.

17

## THE LARGEST PERMITTEES

The 500 permittees that controlled the largest number of AMs accounted for 6.1 percent of the total number of permittees in the data base. About 48 percent of the AMs in the data base, or almost 4.5 million AMs, were controlled by these permittees. Table 2.2 shows that the average number of AMs controlled by the permittees in this category was 8,934. Region 4 had the largest number of permittees and AMs in this breakout. Region 1 had the smallest number of permittees in this breakout, but these permittees controlled the largest average number of AMs.

### Table 2.2: 500 Permittees Controlling the Largest Number of AMs

| Forest Service region | Number of permittees | Total AMs | Average AMs |
|---|---|---|---|
| Region 1 | 9 | 204,258 | 22,695 |
| Region 2 | 114 | 1,002,336 | 8,792 |
| Region 3 | 130 | 929,080 | 7,147 |
| Region 4 | 193 | 1,936,553 | 10,034 |
| Region 5 | 20 | 151,256 | 7,563 |
| Region 6 | 34 | 243,616 | 7,165 |
| Total | 500 | 4,467,099 | 8,934[a] |

[a]This figure is the average for the largest 500 permittees.

18

We also calculated the percentage of AMs controlled by the
1,000 and 2,000 largest permittees in the data base.  Figure 2.1
shows that, compared with the 500 largest permittees, the 1,000 and
2,000 largest permittees--accounting for 12.2 percent and 24.4
percent, respectively, of the permittees in regions 1 through 6--
controlled the use of 63 percent and 79 percent of the total
allowable AMs in these regions.

**Figure 2.1:  Percentage of Western Region Permittees and AMs
Covered by the 500, 1,000 and 2,000 Largest Permittees With 2 or
More AMs**



## THE SMALLEST PERMITTEES

The 500 permittees that controlled the smallest number of AMs in the data base accounted for 6.1 percent of the total permittees in the data base. About .09 percent of the total AMs, or 8,476 AMs, were controlled by these permittees. As shown in table 2.3, the permittees in this category controlled an average of 17 AMs each. Region 4 had the largest number of permittees and AMs in this group, while Region 6 had the smallest number.

Table 2.3:  500 Permittees, With 2 AMs or More, Controlling the Smallest Number of AMs

| Forest Service region | Number of permittees | Total AMs | Average AMs |
|---|---|---|---|
| Region 1 | 135 | 1,966 | 15 |
| Region 2 | 64 | 1,073 | 17 |
| Region 3 | 83 | 1,483 | 18 |
| Region 4 | 177 | 3,182 | 18 |
| Region 5 | 22 | 438 | 20 |
| Region 6 | 19 | 334 | 18 |
| Total | 500 | 8,476 | 17[a] |

[a]This figure is the average for the smallest 500 permittees.

20

We also calculated the percentage of AMs controlled by the 1,000 and 2,000 smallest permittees in the data base. As shown in figure 2.2, compared to the smallest 500 permittees, these groups controlled .3 and 1.3 percent, respectively, of the total allowable AMs in the western regions.

**Figure 2.2:    Percentage of Western Region Permittees and AMs Covered by the 500, 1,000, and 2,000 Smallest Permittees With 2 or More AMs**



21

## STRATIFICATION OF ALL FOREST SERVICE PERMITTEES

To determine how the number of permittees in the Forest Service compared to the number of AMs controlled by these permittees, we stratified the data base for regions 1 through 6 into seven categories on the basis of the number of AMs allowed to be grazed. Table 2.4 shows that more Forest Service permittees in the western regions fell into the 101-to-500 AM category than in any other category. The categories with the fewest Forest Service permittees in these regions were the 2-to-10 AM and the over-10,000 AM categories, which had an almost equal number of permittees.

**Table 2.4: Western Region Grazing Permittees, by Category, With 2 or More AMs**

| Number of AMs | Number of permittees | Total AMs | Average AMs |
|---|---|---|---|
| 2 to 10 | 121 | 748 | 6 |
| 11 to 100 | 1,534 | 81,911 | 53 |
| 101 to 500 | 3,107 | 809,366 | 260 |
| 501 to 1,000 | 1,365 | 973,552 | 713 |
| 1,001 to 5,000 | 1,743 | 3,618,849 | 2,076 |
| 5,001 to 10,000 | 217 | 1,512,999 | 6,972 |
| Over 10,000 | 119 | 2,251,814 | 18,923 |
| Total | 8,206 | 9,249,239 | 1,127[a] |

[a]This figure is the average for these permittees.

22

We combined the seven categories into four groups to depict graphically how the permittees and the AMs they control were distributed. As shown in figure 2.3, 58 percent of the permittees control between 2 and 500 AMs each. These permittees control 892,025 AMs, or 9.6 percent of the total AMs allowed. In contrast, 4.1 percent of Forest Service permittees in the western regions control more than 5,000 AMs each. These permittees control the use of 3.8 million AMs, or about 41 percent of the total AMs allowed.

**Figure 2.3: Percentage of Western Region Permittees and AMs, by Group, With 2 or More AMs**



## THE FOREST SERVICE'S DATA BASE
## AND ITS LIMITATIONS

To prepare the profile of the Forest Service's grazing
allotments and permittees, we obtained data from Forest Service
headquarters officials in the Range Management Division.  Because
the Forest Service has no central data base for grazing
information, officials at headquarters requested officials at each
forest to compile the information.  Regional officials coordinated
the effort for all forests in their region and sent the most recent
information available to the Forest Service's staff at
headquarters.  The headquarters staff then consolidated the data
and sent it to us.  Because the allotment data was found to be
incomplete, we requested new data from the Forest Service.  As a
result, the allotment and permittee data might have been taken
during different time periods.  These data bases provided us with
information pertaining to every active Forest Service permittee and
allotment in regions 1 through 6, including the allotment number,
the allotment location, the amount of federal land in the
allotment, the permittee number, the permit holder's name, and the
number of animal months (AM) controlled by the permittee.

There were some limitations to the data that affected the
information we could report.  These limitations include the
following:

-- Forest Service data were organized by permittee number.  A
   permittee number may encompass more than one permit, but not
   necessarily all of the permits held by a permittee.  For
   example, a livestock operator may hold permits under one
   permittee number using the name "John Smith" and other permits
   under another permittee number using the name "Smith Ranch."
   These permittee numbers would show up individually in the data

24

base and in our profile and each could cover one or more
permits. We did not consolidate all of the permittee numbers
that had been issued to a particular livestock operator into one
entry. Consequently, an operator holding more than one
permittee number may be represented in our profile more than
once. For this report, we refer to each permittee number as a
permittee.

-- Permittee numbers assigned to grazing associations were counted
as one entry in the data base, even though several livestock
operators may have the authority to graze livestock under the
permits associated with that permittee number. According to a
Forest Service Range Management official, grazing associations
are responsible for determining which individual operators will
be allowed to graze their livestock each year and the number of
AMs allowed to each operator, up to the limit specified in the
permit. We did not identify how many livestock operators
actually used these allotments.

-- The data gathered and sent to us by the Forest Service does not
agree with the Forest Service's fiscal year 1991 annual report.
The annual report lists 550 more allotments and 8.2 million more
acres in regions 1 through 6, all sizes of allotments included.
The Forest Service's Chief of Range Management could not explain
these differences. However, he commented that the Forest
Service recently changed its data collection procedures and
that, in the future, such data should be more accurate and
consistent.

APPENDIX II                                        APPENDIX II

## MAJOR CONTRIBUTORS TO THIS FACT SHEET

### RESOURCES, COMMUNITY, AND ECONOMIC DEVELOPMENT DIVISION, WASHINGTON, D.C.

**Ralph Lamoreaux, Assistant Director**
**Eileen Cortese, Assignment Manager**

### SEATTLE REGIONAL OFFICE

**Larry Feltz, Issue Area Manager**
**Brent Hutchison, Evaluator-in-Charge**
**Joe Martorelli, Computer Programmer Analyst**

(140674) ·

**Ordering Information**

The first copy of each GAO report and testimony is free.
Additional copies are $2 each. Orders should be sent to the
following address, accompanied by a check or money order
made out to the Superintendent of Documents, when
necessary. Orders for 100 or more copies to be mailed to a
single address are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20884-6015

or visit:

Room 1000
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000
or by using fax number (301) 258-4066.

PRINTED ON ♻ RECYCLED PAPER

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100

# AUTHORITIES NOT IN REPORTER

**(4) National Forest Service: Forest Service Handbook "Law Enforcement Handbook" FSH 5309.11, Chapter 30**

WO AMENDMENT 5309.11-2021-1
EFFECTIVE DATE: 04/08/2021
DURATION: This amendment is effective until superseded or removed

5309.11_30
Page 11 of 39

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK
CHAPTER 30 - VIOLATIONS**

3.  The safety or rights of others are in jeopardy.

4.  Where a violation has resulted in loss or damage of public property and/or may result in a claim for or against the Government, FPOs should consult with law enforcement personnel prior to issuance of a Violation Notice whenever practical.

## 32 - ISSUING ORDERS UNDER TITLE 36, CODE OF FEDERAL REGULATIONS, PART 261, SUBPART B

### 32.1 - Scope of Orders

Orders issued under the authority provided in Title 36, CFR, sections 261.50(a) and (b) are for the purpose of closing or restricting an area or National Forest System road or trail in which the Chief, each Regional Forester, each Station Director, the Administrator of the Lake Tahoe Basin Management Unit, and each Forest Supervisor has jurisdiction. These sections require the signature of the named line officer; therefore, neither deputies nor actings should sign orders. Where the line officer position is vacant or exigencies exist, coordinate designation or delegation needs with the Office of the General Counsel (OGC).

Prohibitions contained within 36 CFR Part 261, Subpart B orders may not prohibit more than what is specified in the cited regulation. They may however be less restrictive, by either dropping a restriction or making an exception. Exercise care when changing wording to assure that the prohibition is not being made more restrictive and to avoid changing the concept or purpose of the basic prohibition. Assistance in modifying such prohibitions may be requested from the OGC.

### 32.11 - Exemptions

An order may exempt any of the following persons from any of the prohibitions contained in the order:

1.  Persons with a permit specifically authorizing the otherwise prohibited act or omission.

2.  Owners or lessees of land in the area.

3.  Residents in the area.

4.  Any Federal, State, or local officer, or member of an organized rescue or firefighting force in the performance of an official duty.

5.  Persons engaged in a business, trade, or occupation in the area.

6.  Any other person meeting exemption requirements specified in the order.

WO AMENDMENT 5309.11-2021-1
EFFECTIVE DATE: 04/08/2021
DURATION: This amendment is effective until superseded or removed

5309.11_30
Page 12 of 39

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK**
**CHAPTER 30 - VIOLATIONS**

## 32.2 - Legality of Orders

Each order must be drafted properly so that it can withstand legal challenge. Violation of a regional or forest order constitutes a criminal offense and has the potential result of placing a citizen in jail; specific justification and documentation must support each order. To ensure that future orders can withstand court challenges, an order review process should be implemented by the originating unit that will involve forest resource staff, law enforcement personnel, and the Office of the General Counsel.

WO AMENDMENT 5309.11-2021-1
EFFECTIVE DATE: 04/08/2021
DURATION: This amendment is effective until superseded or removed

5309.11_30
Page 13 of 39

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK
CHAPTER 30 - VIOLATIONS**

### 32.2 - Exhibit 01

### Example of a Properly Formatted Order

CHUGACH NATIONAL FOREST
Glacier Ranger District
Girdwood, Alaska

Order No. 10-07-10-00-01

FOREST ORDER

Use of Motorized Vehicle off National Forest System Roads

Pursuant to 36 CFR 261.50(a), the following acts are prohibited on the Chugach National Forest:

**Possession or use of a motorized vehicle off road in the Bear Valley area as shown on the attached map. (36 CFR 261.56)**

Pursuant to 36 CFR 261.50(e), the following persons are exempt from this Order:

> 1. Persons with a permit specifically authorizing the otherwise prohibited act or omission.

> 2. Any Federal, State or Local Law Enforcement Officer or member of an organized rescue or fire fighting force in the performance of an official duty.

These prohibitions are in addition to the general prohibitions in 36 CFR Part 261, Subpart A.

Executed in Anchorage, Alaska, this <u>13th</u> day of <u>February</u> 2007.

_____
Jane Doe
Forest Supervisor
Chugach National Forest

Violation of these prohibitions is punishable by a fine of not more than $5,000 for an individual or $10,000 for an organization, imprisonment for not more than 6 months, or both. (16 U.S.C. 551 and 18 U.S.C. 3559 and 3571).

WO AMENDMENT 5309.11-2021-1
EFFECTIVE DATE: 04/08/2021
DURATION: This amendment is effective until superseded or removed

5309.11_30
Page 14 of 39

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK
CHAPTER 30 - VIOLATIONS**

## 32.2 - Exhibit 02

### Content of
### Assessment of Need and Enforcement Plan

1. **Background** - Description of problem, why the Order is proposed, and what should be accomplished by implementation of the Order.

2. **Intent of Subpart B Order** - The rationale behind the order and what should be accomplished. Defines the affected area, road, and trail, the regulated use or user group, exempted persons, and the duration of the order. Any necessary attachments or exhibits shall be prepared by the appropriate staff and included in this plan.

3. **Enforcement Plan** - Describes action to be taken to inform the affected public and effectively implement the provisions of the order in a manner that results in public acceptance, compliance, and safety (for example, planned patrol dates and locations, staffing needs, enforcement strategies, media contacts, and coordination with local public agencies).

WO AMENDMENT 5309.11-2021-1
EFFECTIVE DATE: 04/08/2021
DURATION: This amendment is effective until superseded or removed

5309.11_30
Page 15 of 39

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK**
**CHAPTER 30 - VIOLATIONS**

### 32.2 - Exhibit 03

### SAMPLE ORDER CHECKLIST

| Action | Responsible Official(s) | Initials/Date |
|---|---|---|
| Prepare proposed Order | Appropriate staff(s) | _____ |
| NEPA requirements completed | Appropriate staff | _____ |
| CRIA requirements completed | Appropriate staff | _____ |
| Prepare enforcement plan | LEI with appropriate staff input | _____ |
| Review proposed Order & approve enforcement plan | Patrol Captain or Special Agent in Charge | _____ |
| Review by OGC (as needed) | Regional OGC | _____ |
| Approve Order | Forest Supervisor or Regional Forester (Deputy or Acting Should Not Sign) | _____ |
| Post Order (36 CFR 261.51) | District Ranger/Forest Supervisor | _____ |
| Prepare news releases for Order describing the order and management objectives Describe implementation/action taken for order, such as planned patrols, enforcement strategies, tolerance, contacts to local public agencies. | PAO (with Appropriate Staff/LEI) | _____ |
| Implement plan | LEO/field going personnel | _____ |
| Complete Case File Filing | Order Records Officer | _____ |
| Update Regional Order Database | Special Agent in Charge | _____ |

Case 2:25-cr-00047-DC    Document 57    Filed 08/25/25    Page 98 of 101

WO AMENDMENT 5309.11-2021-1                                                    5309.11_30
EFFECTIVE DATE: 04/08/2021                                                    Page 16 of 39
DURATION: This amendment is effective until superseded or removed

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK
CHAPTER 30 - VIOLATIONS**

## 32.21 - Order Case Files

An order case file must be maintained for each proposed or issued order. The case file should contain an Assessment of Need and Enforcement Plan (sec. 32.4, ex. 01), appropriate National Environmental Policy Act (NEPA) and Civil Rights Impact Analysis (CRIA) documentation and order checklist. Each National Forest System line officer authorized to issue orders shall designate a unit records custodian for all orders issued by that officer. The records custodian is responsible for compiling and maintaining a complete case file for each order, maintaining an original of all signed orders, providing certified authentic copies of orders and relevant case file documents for court or litigation purposes, maintaining the integrity of the case file and ensuring the records, for both current and terminated orders, are kept in a secure file in compliance with FSH 6209.11, section 41. The order case file must be retained in open agency files until the order is terminated, all civil and criminal cases related to the order are resolved, and all appeal periods have expired. Then normal record retention requirements may be followed.

## 32.22 - Maps

Clear, concise and legible maps should be attached to the proposed order to depict a designated area, road, or trail whenever appropriate and possible. The maps should be of high quality, and computer generated when possible.

## 32.23 - Compliance with the National Environmental Policy Act of 1969

Follow procedural guidance in FSH 1909.15 for implementing the National Environmental Policy Act of 1969 (NEPA) relative to regional and forest orders. Orders typically fall within a category of actions that the Secretary of Agriculture and the Chief of the Forest Service have determined may be categorically excluded from documentation in an Environmental Impact Statement (EIS) or Environmental Assessment (EA) (FSH 1909.15, sec. 31). These actions include routine administrative, maintenance, and other actions which normally do not individually or cumulatively have a significant effect on the quality of the human environment (FSH 1909.15, sec. 31.12, category 1). Examples include but are not limited to:

1. Closing a road to protect bighorn sheep during lambing season.

2. Closing an area during a period of extreme fire danger.

If scoping indicates there may be extraordinary circumstances related to and affected by the proposal, further analysis may be necessary. A project file and decision memo are not required but may be prepared for the categories of actions set forth in section 31.12 at the discretion of the responsible official (Forest Supervisor or Regional Forester). Although "short-term" is not defined, orders intended to be in effect permanently or over a long term should receive careful consideration for law enforcement.

Case 2:25-cr-00047-DC    Document 57    Filed 08/25/25    Page 99 of 101

WO AMENDMENT 5309.11-2021-1                                                    5309.11_30
EFFECTIVE DATE: 04/08/2021                                                      Page 17 of 39
DURATION: This amendment is effective until superseded or removed

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK
CHAPTER 30 - VIOLATIONS**

While preparation of a NEPA project file and decision memo is discretionary, responsible officials must prepare an order case file that includes documentation in support of issuing an order. Documentation of completion of requirements in sections 32.21 should be included.

## 32.24 - Civil Rights Impact Analysis

A Civil Rights Impact Analysis (CRIA) must be completed when required per FSM 1730 and FSH 1709.11. Responsible Forest Service officers shall examine proposed policy actions for civil rights implications (FSM 1730.3). A CRIA is required for actions such as decisions affecting program delivery which will not be published in the Federal Register. Normally routine orders are not policy actions with civil rights implications; however, documentation of the civil rights assessment and determination should be kept in the order case file. A CRIA is integral with the procedures for the social impact analysis included in an EIS or EA, when required (FSH 1709.11, section 31.11).

## 32.25 - Assessment of Need and Enforcement Plan

Ensure an Assessment of Need and Enforcement Plan is completed and approved containing these actions. See section 32.2, exhibit 02 for an example.

## 32.26 - Draft Order Preparation and Review

The appropriate resource staff at the unit level in which the order will be signed shall prepare the draft order and ensure that all other required documentation, as set forth above, is included for the specific case file.

Orders should be prepared in the following sequence:

1. Describe the area to which the order applies in such a manner that a person can clearly recognize the area. Utilize rivers, streams, marshes, lakeshores, roads, geographic names, and other natural or constructed features, in addition to legal land descriptions.

2. Describe the road or trail to which the order applies as indicated in paragraph 1.

3. Specify the times during which the prohibitions apply; for example, May through August.

4. State clearly each prohibition that is applied.

An example of a properly formatted forest order (sec. 32.2, ex. 01) follows. Each proposed order should be routed to the appropriate staff which will perform its respective duty, sign off on the checklist and forward the materials to the next staff area. The checklist should accompany the

WO AMENDMENT 5309.11-2021-1
EFFECTIVE DATE: 04/08/2021
DURATION: This amendment is effective until superseded or removed

5309.11_30
Page 18 of 39

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK
CHAPTER 30 - VIOLATIONS**

proposed order throughout the process to ensure that proper documentation and review is completed. Any National Environmental Policy Act and Civil Rights Impact Analysis documentation prepared by the responsible official must accompany the proposed order.

A copy of the proposed order case file and order checklist shall be submitted to the unit's assigned Law Enforcement and Investigations patrol captain (PC) for a forest supervisor's order, or to the special agent in charge (SAC) for a Regional Forester's order. The PC or SAC shall review the proposed order to ensure that:

    1. The proposed order is formatted properly;

    2. The correct 36 CFR Part 261, Subpart B regulation is applied and properly cited;

    3. The text of the order describing the prohibited act, exemptions, and applicable locations are sufficient, understandable, enforceable, and all necessary exhibits and attachments are clear, concise and defendable;

    4. The order meets the local prosecutorial guidelines; and

    5. The order complies with the Assessment of Need and Enforcement Plan and 36 CFR 261.50 (a)-(e).

After review by the appropriate PC or SAC, law enforcement personnel will facilitate any necessary legal review by Office of the General Counsel, coordinate any necessary edits or correction with the proposing unit, and track the timely return of the proposed order to the originating forest or regional staff.

After the review process is completed and the draft order returned to the proposing unit, it shall be executed and dated by the applicable line officer for implementation and posting as required by 36 CFR 261.51. The unit records custodian shall keep the original approved order in the order case file for maintenance and protection. A database of all orders should be maintained by the SAC to ensure consistency and accuracy with an order's status region wide (that is, active, superceded, or terminated). A consistent numbering format shall be established by each region. The suggested national standard is: Order # 10-05-20-07-01, where:

    1. 10 is the Region, regional orders will designate forest and district as 00.

    2. 05 is the forest.

    3. 20 is the district.

    4. 07 is the fiscal year.

    5. 01 is the sequential numbering of the order for the issuing officer.

Case 2:25-cr-00047-DC   Document 57   Filed 08/25/25   Page 101 of 101

WO AMENDMENT 5309.11-2021-1
EFFECTIVE DATE: 04/08/2021
DURATION: This amendment is effective until superseded or removed

5309.11_30
Page 19 of 39

**FSH 5309.11 - LAW ENFORCEMENT HANDBOOK**
**CHAPTER 30 - VIOLATIONS**

In the event of emergency conditions that may threaten public or employee safety, natural resources, or Government property, an order may be approved by the responsible line officer without prior completion of the above requirements. However, any interdisciplinary review and required supporting documentation for the relevant case file must be completed as soon as practicable.

## 32.3 - Posting of Orders

Place a copy of the order imposing each prohibition in all Forest Service administrative offices affected by the order. Orders must be posted in a location accessible to the general public (for example, front desk). Display each prohibition imposed by an order in such locations and manner to reasonably bring the prohibition to the attention of the public (36 CFR 261.51).

## 32.4 - Enforcement of Orders

Do not issue an order that applies a prohibition to a unit unless it is clearly needed, and a unit is prepared to implement it. Implementing an order requires enforcement action by forest officers authorized to do so. The issuing officer shall coordinate with appropriate law enforcement personnel to ensure implementation and ongoing updates of the enforcement plan for the order. Unit law enforcement planning (FSM 5310) may also be used to identify order enforcement needs and priorities on each unit.

## 33 - RENEWALS AND TERMINATION OF EXISTING ORDERS

The issuing line officer shall review each issued order annually to determine if there is a continuing need for the prohibition or exemptions listed in the order, and that the order is not in conflict with other issued orders or current regulations under 36 CFR Part 261, Subpart A.

If an order is to be terminated, the affected staff shall prepare a Termination of Order. This document must declare the prohibition is removed on a specific date and must be executed and dated by the line officer position that issued the original order. See exhibit 01 for an example of a termination of an order. The Termination of Order must be attached to the original order and included in the case file. The complete case file must be maintained for at least 3 years after the date the original order is rescinded.

If an order has expired under its own terms, the appropriate staff officer shall be responsible for:

1. Determining if there is a need for continuance of the order.

2. Proposing necessary revisions.

3. Submitting the revised order to the line officer for approval following the checklist.

4. Ensuring a complete and properly executed revised order is included in the case file.